# FEDERAL ENERGY REGULATORY COMMISSION
## ET AL. *v.* MISSISSIPPI ET AL.

No. 80–1749.   Argued January 19, 1982—Decided June 1, 1982

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, and STEVENS, JJ., joined. POWELL, J., filed an opinion concurring in part and dissenting in part, *post*, p. 771. O'CONNOR, J., filed an opinion concurring in the judgment in part and dissenting in part, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 775.

*Solicitor General Lee* argued the cause for appellants. With him on the briefs were *Assistant Attorney General Dinkins, Deputy Solicitor General Claiborne, Elliott Schulder, Kathryn A. Oberly, Susan Virginia Cook, Jerome M. Feit,* and *Joanne Leveque.*

*Alex A. Alston, Jr.*, argued the cause for appellees. With him on the brief for appellees State of Mississippi et al. were *Hiram Eastland, Hubbard T. Saunders IV, Bill Allain,* Attorney General of Mississippi, and *Bennett E. Smith,* Assistant Attorney General. *Joshua Green* and *James K. Child, Jr.*, filed a brief for appellee Mississippi Power & Light Co.*

---

*Briefs of *amici curiae* urging reversal were filed by *Roger E. Warin, Stephen H. Sachs,* Attorney General of Maryland, *Eleanor M. Carey,* Associate Deputy Attorney General, *Roger Davis, Norman L. Dean, Jr.,* and *Alan S. Miller* for the State of Maryland et al.; by *Peter N. Wells* for the County of Onondaga, N. Y.; by *William M. Bradner, Jr.,* and *Rigdon H. Boykin* for the American Paper Institute, Inc.; by *Janice E. Kerr, Hector Anninos,* and *Randolph W. Deutsch* for the California Public Utilities Commission; by *Peter W. Brown, Richard A. Hesse,* and *James E. Tierney,* Attorney General of Maine, for the Energy Law Institute et al.; by *Robert E. Bethea, A. Bernard Bays,* and *Gerald A. Sumida* for the Hawaii Sugar Planters' Association; by *Samuel Efron, David J. Bardin, James P. Mercurio,* and *Lewis E. Leibowitz* for Hoffman-La Roche Inc. et al.; by *Gerry Levenberg, R. Keith Guthrie, William Brashares,* and *John J. Gunther* for the National Alliance for Hydroelectric Energy et al.; and by *Robert H. Loeffler, Alan Cope Johnston,* and *Henry D. Levine* for Windfarms, Ltd., et al.

Briefs of *amici curiae* urging affirmance were filed by *Northcutt Ely, Frederick H. Ritts,* and *Robert F. Pietrowski, Jr.*, for the American Public Power Association; by *David G. Hanes, John D. McGrane,* and *Andrew P. Carter* for Arkansas Power & Light Co. et al.; by *Walter A. Bossert, Jr.,* and *Davison W. Grant* for Central Hudson Gas & Electric Corp.; by *Harold R. Schmidt, William R. Cockrell, Jr.,* and *Steve C. Griffith, Jr.,* for Duke Power Co. et al.; by *William B. Killian* for Florida Power & Light Co.; by *R. Gordon Gooch, J. Patrick Berry,* and *William R. Brown* for Houston Lighting & Power Co. et al.; by *Roger J. Marzulla* and *Gale A. Norton* for the Mountain States Legal Foundation; by *Edward A. Caine* and *William Dana Shapiro* for Potomac Electric Power Co.; and by *Wayne T. Elliott, Allen R. Hirons,* and *G. Stephen Parker* for the Southeastern Legal Foundation, Inc.

Briefs of *amici curiae* were filed by *David Frohnmayer,* Attorney General of Oregon, and *William F. Gary,* Solicitor General, for the Department of Energy of the State of Oregon; by *Mark White,* Attorney General, *John W. Fainter, Jr.,* First Assistant Attorney General, *Richard E. Gray III,* Executive Assistant Attorney General, and *James R. Myers, Justin Andrew Kever,* and *John Stuart Fryer,* Assistant Attorneys Gen-

JUSTICE BLACKMUN delivered the opinion of the Court.

In this case, appellees successfully challenged the constitutionality of Titles I and III, and of § 210 of Title II, of the Public Utility Regulatory Policies Act of 1978, Pub. L. 95–617, 92 Stat. 3117 (PURPA or Act). We conclude that appellees' challenge lacks merit and we reverse the judgment below.

I

On November 9, 1978, President Carter signed PURPA into law.[1] The Act was part of a package of legislation,[2] approved the same day, designed to combat the nationwide energy crisis.

At the time, it was said that the generation of electricity consumed more than 25% of all energy resources used in the United States. S. Rep. No. 95–442, p. 7 (1977). Approximately one-third of the electricity in this country was generated through use of oil and natural gas, and electricity generation was one of the fastest growing segments of the Nation's economy. S. Rep. No. 95–361, p. 32 (1977). In part because of their reliance on oil and gas, electricity utilities were plagued with increasing costs and decreasing efficiency in the use of their generating capacities; each of these

eral, for the State of Texas; by *William M. Chamberlain* for the California Energy Resources Conservation and Development Commission; by *David Crump* for the Legal Foundation of America; by *Marshall B. Brinkley* for the Louisiana Public Service Commission; and by *S. Eason Balch, S. Eason Balch, Jr.,* and *Ben H. Stone,* for Southern Company Services, Inc., et al.

[1] The Senate vote was taken on October 9, 1978. The Mississippi Senators voted against the bill. See 124 Cong. Rec. 34780. The House vote was taken on October 14, 1978. The five-member Mississippi delegation voted three "ayes" and two "nays." See *id.,* at 38503.

[2] In addition to PURPA, the package included the Energy Tax Act of 1978, Pub. L. 95–618, 92 Stat. 3174; the National Energy Conservation Policy Act, Pub. L. 95–619, 92 Stat. 3206; the Powerplant and Industrial Fuel Use Act of 1978, Pub. L. 95–620, 92 Stat. 3289; and the Natural Gas Policy Act of 1978, Pub. L. 95–621, 92 Stat. 3351.

factors had an adverse effect on rates to consumers and on the economy as a whole. S. Rep. No. 95–442, at 9. Congress accordingly determined that conservation by electricity utilities of oil and natural gas was essential to the success of any effort to lessen the country's dependence on foreign oil, to avoid a repetition of the shortage of natural gas that had been experienced in 1977, and to control consumer costs.

## A

### Titles I and III

PURPA's Titles I and III, which relate to regulatory policies for electricity and gas utilities, respectively, are administered (with minor exceptions) by the Secretary of Energy. These provisions are designed to encourage the adoption of certain retail regulatory practices. The Titles share three goals: (1) to encourage "conservation of energy supplied by . . . utilities"; (2) to encourage "the optimization of the efficiency of use of facilities and resources" by utilities; and (3) to encourage "equitable rates to . . . consumers." §§ 101 and 301, 92 Stat. 3120 and 3149, 16 U. S. C. § 2611 (1976 ed., Supp. IV), 15 U. S. C. § 3201 (1976 ed., Supp. IV).[3] To achieve these goals, Titles I and III direct state utility regulatory commissions and nonregulated utilities to "consider" the adoption and implementation of specific "rate design" and regulatory standards.

Section 111(d) of the Act, 16 U. S. C. § 2621(d), requires each state regulatory authority and nonregulated utility to consider the use of six different approaches to structuring rates: (1) promulgation, for each class of electricity consumers, of rates that, "to the maximum extent practicable," would "reflect the costs of . . . service to such class"; (2)

---

[3] For simplicity of citation, and to avoid repetition, unless otherwise noted herein, any reference to 15 or 16 U. S. C. relates to Supplement IV of the 1976 edition of the Code.

elimination of declining block rates;[4] (3) adoption of time-of-day rates;[5] (4) promulgation of seasonal rates;[6] (5) adoption of interruptible rates;[7] and (6) use of load management techniques.[8] The Act directed each state authority and non-regulated utility to consider these factors not later than two years after PURPA's enactment, that is, by November 8, 1980, and provided that the authority or utility by November 8, 1981, was to have made a decision whether to adopt the standards. § 2622(b). The statute does not provide penalties for failure to meet these deadlines; the state authority or nonregulated utility is merely directed to consider the standards at the first rate proceeding initiated by the authority after November 9, 1980. § 2622(c).

Section 113 of PURPA, 16 U. S. C. § 2623, requires each state regulatory authority and nonregulated utility to consider the adoption of a second set of standards relating to the

---

[4] "Declining block rates" are a traditional and still common approach used by utilities in their charges for electricity. The highest unit rate is charged for basic electrical consumption, with a declining per-unit price for each block of additional consumption. See S. Rep. No. 95-442, pp. 26-27 (1977).

[5] "Time-of-day rates" are designed to reduce "peak load," the term used to describe the greatest demand for a utility's electricity. Demand varies by hour and season, usually reaching a daily maximum in the afternoon and a seasonal maximum in midsummer or midwinter. A utility must have enough generating capacity to meet that demand; steps that reduce peak demand also reduce the required amount of generating capacity and the use of "peaking" generating equipment, which frequently is gas- or oil-fueled. Under time-of-day rates, utilities charge more for electricity consumed during peak load hours. See id., at 29.

[6] "Seasonal rates" operate to reduce peak load by imposing higher rates during the seasons when demand is greatest.

[7] "Interruptible rates" tend to reduce peak load by charging less for service which the utility can interrupt, or stop, during peak demand periods.

[8] "Load management techniques" are methods used to reduce the demand for electricity at peak times. For example, a utility might employ remote-control devices that temporarily turn off applicances during periods when the demand is particularly great.

terms and conditions of electricity service: (1) prohibition of master-metering in new buildings;[9] (2) restrictions on the use of automatic adjustment clauses;[10] (3) disclosure to consumers of information regarding rate schedules; (4) promulgation of procedural requirements relating to termination of service; and (5) prohibition of the recovery of advertising costs from consumers. Similarly, § 303, 15 U. S. C. § 3203, requires consideration of the last two standards—procedures for termination of service and the nonrecovery of advertising costs—for natural gas utilities. A decision as to the standards contained in §§ 113 and 303 was to have been made by November 1980, although, again, no penalty was provided by the statute for failure to meet the deadline.

Finally, § 114 of the Act, 16 U. S. C. § 2624, directs each state authority and nonregulated utility to consider promulgation of "lifeline rates"—that is, lower rates for service that meets the essential needs of residential consumers—if such rates have not been adopted by November 1980.

Titles I and III also prescribe certain procedures to be followed by the state regulatory authority and the nonregulated utility when considering the proposed standards. Each standard is to be examined at a public hearing after notice, and a written statement of reasons must be made available to the public if the standards are not adopted. 16 U. S. C. §§ 2621(b) and (c)(2), and §§ 2623(a) and (c); 15 U. S. C. §§ 3203(a) and (c). "Any person" may bring an action in state court to enforce the obligation to hold a hearing and

---

[9] "Master-metering" is the use of one meter for several living units. Studies have shown that tenants of master-metered buildings use 35% more electricity, on the average, than tenants of buildings where each apartment has its own meter. See *id.*, at 31.

[10] An "automatic adjustment clause" provides that as a utility's fuel costs rise it may increase its rates without public hearing or review by the state regulatory authority. A clause of this kind provides the utility with no incentive to reduce its costs or to shift away from oil- or gas-fueled generating facilities, and therefore tends to discourage the efficient use of energy resources.

make determinations on the PURPA standards. 16 U. S. C. § 2633(c)(1); 15 U. S. C. § 3207(b)(1).

The Secretary of Energy, any affected utility, and any consumer served by an affected utility is given the right to intervene and participate in any rate-related proceeding considering the Title I standards. 16 U. S. C. § 2631(a). Under Title III, the Secretary alone has the right to intervene. 15 U. S. C. § 3205. Any person (including the Secretary) who intervenes or otherwise participates in the proceeding may obtain review in state court of any administrative determination concerning the Title I standards, 16 U. S. C. § 2633 (c)(1), and the Secretary has the right to participate as an *amicus* in any Title III judicial review proceeding initiated by another. 15 U. S. C. § 3207(b)(2). The right to intervene is enforceable against the state regulatory authority by an action in federal court. 16 U. S. C. § 2633(b); 15 U. S. C. § 3207(a)(2).

Titles I and III also set forth certain reporting requirements. Within one year of PURPA's enactment, and annually thereafter for 10 years, each state regulatory authority and nonregulated utility is to report to the Secretary "respecting its consideration of the standards established." 16 U. S. C. § 2626(a); 15 U. S. C. § 3209(a). The Secretary, in turn, is to submit a summary and analysis of these reports to Congress. 16 U. S. C. § 2626(b); 15 U. S. C. § 3209(b). Electricity utilities also are required to collect information concerning their service costs. 16 U. S. C. § 2643. This information is to be filed periodically with appellant Federal Energy Regulatory Commission (FERC) and with appropriate state regulatory agencies, and is to be made available to the public. Title III requires the Secretary, in consultation with FERC, state regulatory authorities, gas utilities, and gas consumers, to submit a report to Congress on gas utility rate design. 15 U. S. C. § 3206.

Despite the extent and detail of the federal proposals, however, no state authority or nonregulated utility is required to

adopt or implement the specified rate design or regulatory standards. Thus, 16 U. S. C. §§ 2621(a) and 2623(a) and 15 U. S. C. § 3203(a) all provide: "Nothing in this subsection prohibits any State regulatory authority or nonregulated . . . utility from making any determination that it is not appropriate to implement [or adopt] any such standard, pursuant to its authority under otherwise applicable State law." Similarly, 16 U. S. C. § 2627(b) and 15 U. S. C. § 3208 make it clear that any state regulatory authority or nonregulated utility may adopt regulations or rates that are "different from any standard established by this [subchapter or] chapter."

## B
### Section 210

Section 210 of PURPA's Title II, 92 Stat. 3144, 16 U. S. C. § 824a–3, seeks to encourage the development of cogeneration and small power production facilities.[11] Congress believed that increased use of these sources of energy would reduce the demand for traditional fossil fuels. But it also felt that two problems impeded the development of nontraditional generating facilities: (1) traditional electricity utilities were reluctant to purchase power from, and to sell power to, the nontraditional facilities,[12] and (2) the regulation of these alternative energy sources by state and federal utility

---

[11] A "cogeneration facility" is one that produces both electric energy and steam or some other form of useful energy, such as heat. 16 U. S. C. § 796(18)(A). A "small power production facility" is one that has a production capacity of no more than 80 megawatts and uses biomass, waste, or renewable resources (such as wind, water, or solar energy) to produce electric power. § 796(17)(A).

[12] See 123 Cong. Rec. 25848 (1977) (remarks of Sen. Percy); *id.*, at 32403 (remarks of Sen. Durkin); *id.*, at 32437 (remarks of Sen. Haskell); *id.*, at 32419 (remarks of Sen. Hart); National Energy Act: Hearings on H. R. 6831 et al. before the Subcommittee on Energy and Power of the House Committee on Interstate and Foreign Commerce, 95th Cong., 1st Sess., 552–553 (1977).

authorities imposed financial burdens upon the nontraditional facilities and thus discouraged their development.[13]

In order to overcome the first of these perceived problems, § 210(a) directs FERC, in consultation with state regulatory authorities, to promulgate "such rules as it determines necessary to encourage cogeneration and small power production," including rules requiring utilities to offer to sell electricity to, and purchase electricity from, qualifying cogeneration and small power production facilities. Section 210(f), 16 U. S. C. § 824a–3(f), requires each state regulatory authority and nonregulated utility to implement FERC's rules. And § 210(h), 16 U. S. C. § 824a–3(h), authorizes FERC to enforce this requirement in federal court against any state authority or nonregulated utility; if FERC fails to act after request, any qualifying utility may bring suit.

To solve the second problem perceived by Congress, § 210(e), 16 U. S. C. § 824a–3(e), directs FERC to prescribe rules exempting the favored cogeneration and small power facilities from certain state and federal laws governing electricity utilities.

Pursuant to this statutory authorization, FERC has adopted regulations relating to purchases and sales of electricity to and from cogeneration and small power facilities. See 18 CFR pt. 292 (1980); 45 Fed. Reg. 12214–12237 (1980). These afford state regulatory authorities and nonregulated utilities latitude in determining the manner in which the regulations are to be implemented. Thus, a state commission may comply with the statutory requirements by issuing regulations, by resolving disputes on a case-by-case basis, or by taking any other action reasonably designed to give effect to FERC's rules.[14]

---

[13] See H. R. Conf. Rep. No. 95–1750, p. 98 (1978); H. R. Rep. No. 95–496, pt. 4, p. 157 (1977); 123 Cong. Rec. 32399 (1977) (remarks of Sen. Cranston); id., at 32660 (remarks of Sen. Percy).

[14] Congress recognized that a State's compliance with the requirements of PURPA would involve the expenditure of funds. Accordingly, it author-

## II

In April 1979, the State of Mississippi and the Mississippi Public Service Commission, appellees here, filed this action in the United States District Court for the Southern District of Mississippi against FERC and the Secretary of Energy, seeking a declaratory judgment that PURPA's Titles I and III and § 210 are unconstitutional. App. 3.[15] Appellees maintained that PURPA was beyond the scope of congressional power under the Commerce Clause and that it constituted an invasion of state sovereignty in violation of the Tenth Amendment.[16]

Following cross-motions for summary judgment, the District Court, in an unreported opinion, held that in enacting PURPA Congress had exceeded its powers under the Commerce Clause. App. to Juris. Statement 1a. The court observed that the Mississippi Public Service Commission by state statute possessed the "power and authority to regulate and control intrastate activities and policies of all utilities operating within the sovereign state of Mississippi." *Id.*, at 2a. Relying on *Carter* v. *Carter Coal Co.*, 298 U. S. 238 (1936), the court stated: "There is literally nothing in the Commerce Clause of the Constitution which authorizes or justifies the federal government in taking over the regulation and control of public utilities. These public utilities were ac-

---

ized the Secretary of Energy to make grants to state regulatory authorities to assist them in carrying out the provisions of Titles I and III, including the reporting requirements, and the provisions of § 210. See 42 U. S. C. § 6807 (1976 ed., Supp. IV).

For each of the fiscal years 1979 and 1980, Congress authorized for appropriation up to $40 million to help state regulatory authorities defray the costs of complying with PURPA. Pub. L. 95–617, § 142(1), 92 Stat. 3134, 42 U. S. C. § 6808(1) (1976 ed., Supp. IV).

[15] Mississippi Power & Light Company was permitted to intervene in the action as a plaintiff and is also an appellee here.

[16] "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U. S. Const., Amdt. 10.

tually unknown at the writing of the Constitution." App. to Juris. Statement 4a. Indeed, in the court's view, the legislation "does not even attempt to regulate commerce among the several states but it is a clear usurpation of power and authority which the United States simply does not have under the Commerce Clause of the Constitution." *Id.*, at 7a.

Relying on *National League of Cities* v. *Usery*, 426 U. S. 833 (1976), the court also concluded that PURPA trenches on state sovereignty.[17] It therefore pronounced the statutory provisions void because "they constitute a direct intrusion on integral and traditional functions of the State of Mississippi." App. to Juris. Statement 8a–9a. For reasons it did not explain, the court also relied on the guarantee of a republican form of government, U. S. Const., Art. IV, § 4, and on the Supremacy Clause, Art. VI, cl. 2. App. to Juris. Statement 2a, n. 1, and 9a.

FERC and the Secretary of Energy appealed directly to this Court pursuant to 28 U. S. C. § 1252. See *Hodel* v. *Virginia Surface Mining & Recl. Assn., Inc.*, 452 U. S. 264, 274, n. 15 (1981). We noted probable jurisdiction. 452 U. S. 936 (1981).

### III

### The Commerce Clause

We readily conclude that the District Court's analysis and the appellees' arguments are without merit so far as they concern the Commerce Clause. To say that nothing in the Commerce Clause justifies federal regulation of even the intrastate operations of public utilities misapprehends the proper role of the courts in assessing the validity of federal legislation promulgated under one of Congress' plenary powers. The applicable standard was reiterated just last Term in *Hodel* v. *Indiana*, 452 U. S. 314 (1981):

---

[17] "The sovereign state of Mississippi is not a robot, or lackey which may be shuttled back and forth to suit the whim and caprice of the federal government." App. to Juris. Statement 2a.

"It is established beyond peradventure that 'legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality . . . .' *Usery* v. *Turner Elkhorn Mining Co.,* 428 U. S. 1, 15 (1976). . . . A court may invalidate legislation enacted under the Commerce Clause only if it is clear that there is no rational basis for a congressional finding that the regulated activity affects interstate commerce, or that there is no reasonable connection between the regulatory means selected and the asserted ends." *Id.,* at 323–324.[18]

Despite these expansive observations by this Court, appellees assert that PURPA is facially unconstitutional because it does not regulate "commerce"; instead, it is said, the Act directs the nonconsenting State to regulate in accordance with federal procedures. This, appellees continue, is beyond Congress' power: "In exercising the authority conferred by this clause of the Constitution, Congress is powerless to regulate anything which is not commerce, as it is powerless to do anything about commerce which is not regulation." *Carter*

---

[18] In the companion case decided the same day, this Court observed:

"Judicial review in this area is influenced above all by the fact that the Commerce Clause is a grant of plenary authority to Congress. . . . This power is 'complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution.' *Gibbons* v. *Ogden,* 9 Wheat. 1, 196 (1824). Moreover, this Court has made clear that the commerce power extends not only to 'the use of channels of interstate or foreign commerce' and to 'protection of the instrumentalities of interstate commerce . . . or persons or things in commerce,' but also to 'activities affecting commerce.' *Perez* v. *United States,* 402 U. S. 146, 150 (1971). As we explained in *Fry* v. *United States,* 421 U. S. 542, 547 (1975), '[e]ven activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States or with foreign nations.'" *Hodel* v. *Virginia Surface Mining & Recl. Assn., Inc.,* 452 U. S. 264, 276–277 (1981).

v. *Carter Coal Co.*, 298 U. S., at 297. The "governance of commerce" by the State is to be distinguished from commerce itself, for regulation of the former is said to be outside the plenary power of Congress.[19]

It is further argued that the proper test is not whether the regulated activity merely "affects" interstate commerce but, instead, whether it has "a substantial effect" on such commerce, citing JUSTICE REHNQUIST's opinion concurring in the judgment in the *Hodel* cases, 452 U. S., at 311–312. PURPA, appellees maintain, does not meet this standard.

The difficulty with these arguments is that they disregard entirely the specific congressional finding, in § 2 of the Act, 16 U. S. C. § 2601, that the regulated activities have an immediate effect on interstate commerce. Congress there determined that "the protection of the public health, safety, and welfare, the preservation of national security, and the proper exercise of congressional authority under the Constitution to regulate interstate commerce require," among other things, a program for increased conservation of electric energy, increased efficiency in the use of facilities and resources by electricity utilities, and equitable retail rates for electricity consumers, as well as a program to improve the wholesale distribution of electric energy, and a program for the conservation of natural gas while ensuring that rates to gas consumers are equitable. 16 U. S. C. § 2601. The findings, thus, are clear and specific.

The Court heretofore has indicated that federal regulation of intrastate power transmission may be proper because of the interstate nature of the generation and supply of electric power. *FPC* v. *Florida Power & Light Co.*, 404 U. S. 453 (1972). Our inquiry, then, is whether the congressional find-

---

[19] For this proposition, appellees rely on *Brown* v. *EPA*, 521 F. 2d 827, 839 (CA9 1975), vacated and remanded, 431 U. S. 99 (1977), and *District of Columbia* v. *Train*, 172 U. S. App. D. C. 311, 332, 521 F. 2d 971, 992 (1975), vacated and remanded *sub nom. EPA* v. *Brown*, 431 U. S. 99 (1977).

ings have a rational basis. *Hodel* v. *Virginia Surface Mining & Recl. Assn., Inc.*, 452 U. S., at 277; *Hodel* v. *Indiana*, 452 U. S., at 323–324.

The legislative history provides a simple answer: there is ample support for Congress' conclusions. The hearings were extensive. Committees in both Houses of Congress noted the magnitude of the Nation's energy problems and the need to alleviate those problems by promoting energy conservation and more efficient use of energy resources. See S. Rep. No. 95–442, at 7–10; H. R. Rep. No. 95–543, vol. I, pp. 5–10 (1977); H. R. Rep. No. 95–496, pt. 4, pp. 3–7, 125–130 (1977).[20] Congress was aware that domestic oil production had lagged behind demand and that the Nation had become increasingly dependent on foreign oil. *Id.*, at 3. The House Committee observed: "Reliance upon imported oil to meet the bulk of U. S. oil demands could seriously jeopardize the stability of the Nation's economy and could undermine the independence of the United States." *Ibid.* See H. R. Rep. No. 95–543, vol. I, at 5–6. Indeed, the Nation had recently experienced severe shortages in its supplies of natural gas. *Id.*, at 7. The House and Senate Committees both noted that the electricity industry consumed more than 25% of the total energy resources used in this country while supplying only 12% of the user demand for energy. S. Rep. No. 95–442, at 7–8; H. R. Rep. No. 95–496, pt. 4, at 125. In recent years, the electricity utility industry had been beset by numerous problems, *id.*, at 129, which resulted in higher bills for the consuming public, a result exacerbated by the rate structures employed by most utilities. S. Rep. No. 95–442, at 26. Congress naturally concluded that the energy prob-

---

[20] See also 124 Cong. Rec. 34558 (1978) (remarks of Sen. Jackson); *id.*, at 34560 (remarks of Sen. Bumpers); *id.*, at 34776 (remarks of Sen. Robert C. Byrd); *id.*, at 38350 (remarks of Rep. Ashley); *id.*, at 38370–38371 (remarks of Rep. Dingell); 123 Cong. Rec. 25894 (1977) (remarks of Rep. Ashley); *id.*, at 25916–25917 (remarks of Rep. Ottinger); *id.*, at 27063-27064 (remarks of Rep. Wolff).

lem was nationwide in scope,[21] and that these developments demonstrated the need to establish federal standards regarding retail sales of electricity, as well as federal attempts to encourage conservation and more efficient use of scarce energy resources. See *id.*, at 24–32; H. R. Rep. No. 95–496, pt. 4, at 131–133, 136–138, 170–171.

Congress also determined that the development of cogeneration and small power production facilities would conserve energy. The evidence before Congress showed the potential contribution of these sources of energy: it was estimated that if proper incentives were provided, industrial cogeneration alone could account for 7%–10% of the Nation's electrical generating capacity by 1987. S. Rep. No. 95–442, at 21, 23.

We agree with appellants that it is difficult to conceive of a more basic element of interstate commerce than electric energy, a product used in virtually every home and every commercial or manufacturing facility. No State relies solely on its own resources in this respect. See *FPC* v. *Florida Power & Light Co.*, *supra.* Indeed, the utilities involved in this very case, Mississippi Power & Light Company and Mississippi Power Company, sell their retail customers power that is generated in part beyond Mississippi's borders, and offer reciprocal services to utilities in other States. App. 93–94. The intrastate activities of these utilities, although regulated by the Mississippi Public Service Commission, bring them within the reach of Congress' power over interstate commerce. See *FPC* v. *Florida Power & Light Co.*, 404 U. S., at 458; *New England Power Co.* v. *New Hampshire*, 455 U. S. 331 (1982).[22]

Even if appellees were correct in suggesting that PURPA

---

[21] See, *e. g.*, *id.*, at 32437–32438 (remarks of Sen. Brooke); *id.*, at 32444 (remarks of Sen. Percy).

[22] PURPA could be upheld even if some of its provisions were not directly related to the purpose of fostering interstate commerce: "A complex regulatory program . . . can survive a Commerce Clause challenge without a

will not significantly improve the Nation's energy situation, the congressional findings compel the conclusion that "'the means chosen by [Congress are] reasonably adapted to the end permitted by the Constitution.'" *Hodel* v. *Virginia Surface Mining & Recl. Assn., Inc.*, 452 U. S., at 276, quoting *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241, 262 (1964). It is not for us to say whether the means chosen by Congress represent the wisest choice. It is sufficient that Congress was not irrational in concluding that limited federal regulation of retail sales of electricity and natural gas, and of relationships between cogenerators and electric utilities, was essential to protect interstate commerce. That is enough to place the challenged portions of PURPA within Congress' power under the Commerce Clause.[23] Because PURPA's provisions concern private nonregulated utilities as well as state commissions, the statute necessarily is valid at least insofar as it regulates private parties. See *Hodel* v. *Virginia Surface Mining & Recl. Assn., Inc.*, 452 U. S., at 286.

IV

The Tenth Amendment

Unlike the Commerce Clause question, the Tenth Amendment issue presented here is somewhat novel. This case obviously is related to *National League of Cities* v. *Usery*, 426 U. S. 833 (1976), insofar as both concern principles of state sovereignty. But there is a significant difference as well. *National League of Cities*, like *Fry* v. *United States*, 421 U. S. 542 (1975), presented a problem the Court often con-

---

showing that every single facet of the program is independently and directly related to a valid congressional goal. It is enough that the challenged provisions are an integral part of the regulatory program and that the regulatory scheme when considered as a whole satisfies this test." *Hodel* v. *Indiana*, 452 U. S. 314, 329, n. 17 (1981).

[23] This is not to say the Congress can regulate in an area that is only tangentially related to interstate commerce. See *Maryland* v. *Wirtz*, 392 U. S. 183, 196–197, n. 27 (1968). That obviously is not the case here.

fronts: the extent to which state sovereignty shields the States from generally applicable federal regulations. In PURPA, in contrast, the Federal Government attempts to use state regulatory machinery to advance federal goals. To an extent, this presents an issue of first impression.

PURPA, for all its complexity, contains essentially three requirements: (1) § 210 has the States enforce standards promulgated by FERC; (2) Titles I and III direct the States to consider specified ratemaking standards; and (3) those Titles impose certain procedures on state commissions. We consider these three requirements in turn:

A. Section 210. On its face, this appears to be the most intrusive of PURPA's provisions. The question of its constitutionality, however, is the easiest to resolve. Insofar as § 210 authorizes FERC to exempt qualified power facilities from "State laws and regulations," it does nothing more than pre-empt conflicting state enactments in the traditional way. Clearly, Congress can pre-empt the States completely in the regulation of retail sales by electricity and gas utilities and in the regulation of transactions between such utilities and cogenerators. Cf. *Southern Pacific Co.* v. *Arizona,* 325 U. S. 761, 769 (1945). The propriety of this type of regulation—so long as it is a valid exercise of the commerce power—was made clear in *National League of Cities,* and was reaffirmed in *Hodel* v. *Virginia Surface Mining & Recl. Assn.:* the Federal Government may displace state regulation even though this serves to "curtail or prohibit the States' prerogatives to make legislative choices respecting subjects the States may consider important." 452 U. S., at 290.

Section 210's requirement that "each State regulatory authority shall, after notice and opportunity for public hearing, *implement* such rule (or revised rule) for each electric utility for which it has ratemaking authority," 16 U. S. C. § 824a–3(f)(1) (emphasis added), is more troublesome. The statute's substantive provisions require electricity utilities to purchase electricity from, and to sell it to, qualifying co-

generator and small power production facilities. § 824a–3(a). Yet FERC has declared that state commissions may implement this by, among other things, "an undertaking to resolve disputes between qualifying facilities and electric utilities arising under [PURPA]." 18 CFR § 292.401(a) (1980). In essence, then, the statute and the implementing regulations simply require the Mississippi authorities to adjudicate disputes arising under the statute. Dispute resolution of this kind is the very type of activity customarily engaged in by the Mississippi Public Service Commission. See, *e. g.*, Miss. Code Ann. §§ 77–1–31, 77–3–5, 77–3–13(3), 77–3–21, 77–3–405 (1973).

*Testa* v. *Katt*, 330 U. S. 386 (1947), is instructive and controlling on this point. There, the Emergency Price Control Act, 56 Stat. 34, as amended, created a treble-damages remedy, and gave jurisdiction over claims under the Act to state as well as federal courts. The courts of Rhode Island refused to entertain such claims, although they heard analogous state causes of action. This Court upheld the federal program. It observed that state courts have a unique role in enforcing the body of federal law, and that the Rhode Island courts had "jurisdiction adequate and appropriate under established local law to adjudicate this action." 330 U. S., at 394. Thus the state courts were directed to heed the constitutional command that "the policy of the federal Act is the prevailing policy in every state," *id.*, at 393, "'and should be respected accordingly in the courts of the State.'" *Id.*, at 392, quoting *Mondou* v. *New York, N. H. & H. R. Co.*, 223 U. S. 1, 57 (1912).

So it is here. The Mississippi Commission has jurisdiction to entertain claims analogous to those granted by PURPA, and it can satisfy § 210's requirements simply by opening its doors to claimants. That the Commission has administrative as well as judicial duties is of no significance.[24] Any other

---

[24] In another context, the Court has noted that "the role of the modern federal hearing examiner or administrative law judge . . . is 'functionally

conclusion would allow the States to disregard both the pre-eminent position held by federal law throughout the Nation, cf. *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 340–341 (1816), and the congressional determination that the federal rights granted by PURPA can appropriately be enforced through state adjudicatory machinery. Such an approach, *Testa* emphasized, "flies in the face of the fact that the States of the Union constitute a nation," and "disregards the purpose and effect of Article VI of the Constitution." 330 U. S., at 389.

B. Mandatory Consideration of Standards. We acknowledge that "the authority to make . . . fundamental . . . decisions" is perhaps the quintessential attribute of sovereignty. See *National League of Cities* v. *Usery*, 426 U. S., at 851. Indeed, having the power to make decisions and to set policy is what gives the State its sovereign nature. See *Bates* v. *State Bar of Arizona*, 433 U. S. 350, 360 (1977) (State Supreme Court speaks as sovereign because it is the "ultimate body wielding the State's power over the practice of law"). It would follow that the ability of a state legislative (or, as here, administrative) body—which makes decisions and sets policy for the State as a whole—to consider and promulgate regulations of its choosing must be central to a State's role in the federal system. Indeed, the 19th-century view, expressed in a well-known slavery case, was that Congress "has no power to impose on a State officer, as such, any duty whatever, and compel him to perform it." *Kentucky* v. *Dennison*, 24 How. 66, 107 (1861).

Recent cases, however, demonstrate that this rigid and isolated statement from *Kentucky* v. *Dennison*—which suggests that the States and the Federal Government in all circumstances must be viewed as coequal sovereigns—is not representative of the law today.[25] While this Court never

---

comparable' to that of a judge." *Butz* v. *Economou*, 438 U. S. 478, 513 (1978).

[25] JUSTICE O'CONNOR reviews the constitutional history at some length, ultimately deriving the proposition that the Framers intended to deny the

has sanctioned explicitly a federal command to the States to promulgate and enforce laws and regulations, cf. *EPA* v. *Brown*, 431 U. S. 99 (1977), there are instances where the Court has upheld federal statutory structures that in effect directed state decisionmakers to take or to refrain from taking certain actions. In *Fry* v. *United States*, 421 U. S. 542 (1975), for example, state executives were held restricted, with respect to state employees, to the wage and salary limitations established by the Economic Stabilization Act of 1970. *Washington* v. *Washington State Commercial Passenger Fishing Vessel Assn.*, 443 U. S. 658 (1979), acknowledged a federal court's power to enforce a treaty by compelling a state agency to "prepare" certain rules "even if state law withholds from [it] the power to do so." *Id.*, at 695.[26] And certainly *Testa* v. *Katt, supra*, by declaring that "the policy of the federal Act is the prevailing policy in every state," 330 U. S., at 393, reveals that the Federal Government has some power to enlist a branch of state government—there the judiciary—to further federal ends.[27] In doing so, *Testa* clearly

Federal Government the authority to exercise "military or legislative power over state governments," *instead* "allow[ing] Congress to pass laws directly affecting individuals." *Post*, at 795. If JUSTICE O'CONNOR means this rhetorical assertion to be taken literally, it is demonstrably incorrect. See, *e. g.*, *Transportation Union* v. *Long Island R. Co.*, 455 U. S. 678 (1982); *Fry* v. *United States*, 421 U. S. 542 (1975); *Parden* v. *Terminal R. Co.*, 377 U. S. 184 (1964); *California* v. *Taylor*, 353 U. S. 553 (1957); *Case* v. *Bowles*, 327 U. S. 92 (1946); *United States* v. *California*, 297 U. S. 175 (1936).

[26] The Court did express doubt as to whether a state agency "may be ordered actually to promulgate regulations having effect as a matter of state law." 443 U. S., at 695. As we have noted, however, PURPA does not require promulgation of particular regulations.

[27] JUSTICE O'CONNOR's partial dissent finds each of these cases inapposite. Yet the purported distinctions are little more than exercises in the art of *ipse dixit*. Thus she suggests that *Testa* v. *Katt* provides no support for the imposition of federal responsibilities on state legislatures, because "the requirement that [state courts] evenhandedly adjudicate state and federal claims falling within their jurisdiction does not infringe any sovereign authority to set an agenda." *Post*, at 784–785. Yet the courts have

cut back on both the quoted language and the analysis of the *Dennison* case of the preceding century.[28]

Whatever all this may forebode for the future, or for the scope of federal authority in the event of a crisis of national

always been recognized as a coequal part of the State's sovereign decision-making apparatus, see *Bates* v. *State Bar of Arizona*, 433 U. S. 350, 360 (1977), and it seems evident that requiring state tribunals to entertain federal claims interferes, at least to a degree, with the State's sovereign prerogatives, see n. 25, *supra*, as well as with the amount of time that state courts may devote to adjudicating state claims. Conversely, it is difficult to perceive any fundamental distinction between the state legislature's power to establish limits on the jurisdiction of state courts, and its prerogative to set ratemaking criteria for use by quasi-legislative utilities commissions. JUSTICE O'CONNOR fails to explain, however, why this does not implicate her concern that "[w]hile engaged in . . . congressionally mandated tasks, state utility commissions are less able to pursue local proposals . . . ." *Post*, at 787.

The partial dissent finds *Fry* v. *United States* inapposite because the wage freeze there at issue " 'displaced no state choices as to how governmental operations should be structured . . . . Instead, it merely required that the wage scales and employment relationships which the States themselves had chosen be maintained . . . .' " *Post*, at 784, n. 13, quoting *National League of Cities* v. *Usery*, 426 U. S. 833, 853 (1976). It seems absurd to suggest, however, that a federal veto of the States' chosen method of structuring their employment relationships is less intrusive in any realistic sense than are PURPA's mandatory consideration provisions. Finally, JUSTICE O'CONNOR would distinguish *Fishing Vessel Assn.* as involving only "[t]he power of a court to enjoin adjudicated violations of federal law." *Post*, at 784, n. 13. In doing so, however, the Court unambiguously held that federal law could impose an affirmative obligation upon state officials to prepare administrative regulations—a holding of obvious relevance to this case.

[28] In *Dennison*, the Court concluded that the state courts entertained federal actions solely as a discretionary "matter of comity, which the several sovereignties extended to one another for their mutual benefit. It was not regarded by either party as an obligation imposed by the Constitution." 24 How., at 109. That analysis cannot survive *Testa*, which squarely held "that state courts do not bear the same relation to the United States that they do to foreign countries." 330 U. S., at 389. And *Testa*, of course, placed the obligation of state officials to enforce federal law squarely in the Supremacy Clause.

proportions, it plainly is not necessary for the Court in this case to make a definitive choice between competing views of federal power to compel state regulatory activity. Titles I and III of PURPA require only *consideration* of federal standards. And if a State has no utilities commission, or simply stops regulating in the field, it need not even entertain the federal proposals. As we have noted, the commerce power permits Congress to pre-empt the States entirely in the regulation of private utilities. In a sense, then, this case is only one step beyond *Hodel* v. *Virginia Surface Mining & Recl. Assn., supra.* There, the Federal Government could have pre-empted all surface mining regulations; instead, it allowed the States to enter the field if they promulgated regulations consistent with federal standards. In the Court's view, this raised no Tenth Amendment problem: "We fail to see why the Surface Mining Act should become constitutionally suspect simply because Congress chose to allow the States a regulatory role." 452 U. S., at 290. "[T]here can be no suggestion that the Act commandeers the legislative

---

Our recent cases also demonstrate that the Federal Government, at least in certain circumstances, can structure the State's exercise of its sovereign powers. In *National League of Cities* v. *Usery, supra,* for example, the Court made clear that the State's regulation of its relationship with its employees is an "undoubted attribute of state sovereignty." 426 U. S., at 845. Yet, by holding "unimpaired" *California* v. *Taylor,* 353 U. S. 553 (1957), which upheld a federal labor regulation as applied to state railroad employees, 426 U. S., at 854, n. 18, *National League of Cities* acknowledged that not all aspects of a State's sovereign authority are immune from federal control. This analysis was restated in *Hodel* v. *Virginia Surface Mining & Recl. Assn., supra,* which indicated that federal regulations are subject to Tenth Amendment attack only if they "regulat[e] the 'States as States,'" "address matters that are indisputably 'attributes of state sovereignty,'" *and* impair the States' "ability 'to structure integral operations in areas of traditional functions.'" 452 U. S., at 287–288, quoting *National League of Cities* v. *Usery,* 426 U. S., at 854, 845, 852. And even when these requirements are met, "[t]here are situations in which the nature of the federal interest advanced may be such that it justifies state submission." *Hodel* v. *Virginia Surface Mining & Recl. Assn., Inc.,* 452 U. S., at 288, n. 29.

processes of the States by directly compelling them to enact and enforce a regulatory program." *Id.*, at 288.

Similarly here, Congress could have pre-empted the field, at least insofar as private rather than state activity is concerned; PURPA should not be invalid simply because, out of deference to state authority, Congress adopted a less intrusive scheme and allowed the States to continue regulating in the area on the condition that they *consider* the suggested federal standards.[29] While the condition here is affirmative in nature—that is, it directs the States to entertain proposals—nothing in this Court's cases suggests that the nature of the condition makes it a constitutionally improper one. There is nothing in PURPA "directly compelling" the States to enact a legislative program. In short, because the two challenged Titles simply condition continued state involvement in a pre-emptible area on the consideration of federal proposals, they do not threaten the States' "separate and independent existence," *Lane County* v. *Oregon*, 7 Wall. 71, 76 (1869); *Coyle* v. *Oklahoma*, 221 U. S. 559, 580 (1911), and do not impair the ability of the States "to function effectively

---

[29] It seems evident that Congress intended to defer to state prerogatives—and expertise—in declining to pre-empt the utilities field entirely. See, *e. g.*, S. Rep. No. 95–442, pp. 9, 13–14 (1977); 124 Cong. Rec. 34558 (1978) (remarks of Sen. Jackson); *id.*, at 34560 (remarks of Sen. Bumpers); *id.*, at 34763 (remarks of Sen. Metzenbaum); *id.*, at 34768 (remarks of Sen. Durkin); 123 Cong. Rec. 32430 (1977) (remarks of Sen. Johnston); *id.*, at 32395 (remarks of Sen. Bartlett).

JUSTICE O'CONNOR's partial dissent's response to this is peculiar. On the one hand, she suggests that the States might prefer that Congress simply pre-empt the field, since that "would leave them free to exercise their power in other areas." *Post*, at 787. Yet JUSTICE O'CONNOR elsewhere acknowledges the importance of utilities regulation to the States, *post*, at 781, and emphasizes that local experimentation and self-determination are essential aspects of the federal system. *Post*, at 787–791. PURPA, of course, *permits* the States to play a continued role in the utilities field, and gives full force to the States' ultimate policy choices. Certainly, it is a curious type of federalism that encourages Congress to pre-empt a field entirely, when its preference is to let the States retain the primary regulatory role.

in a federal system." *Fry* v. *United States*, 421 U. S., at 547, n. 7; *National League of Cities* v. *Usery*, 426 U. S., at 852. To the contrary, they offer the States a vehicle for remaining active in an area of overriding concern.

We recognize, of course, that the choice put to the States— that of either abandoning regulation of the field altogether or considering the federal standards—may be a difficult one. And that is particularly true when Congress, as is the case here, has failed to provide an alternative regulatory mechanism to police the area in the event of state default. Yet in other contexts the Court has recognized that valid federal enactments may have an effect on state policy—and may, indeed, be designed to induce state action in areas that otherwise would be beyond Congress' regulatory authority. Thus in *Oklahoma* v. *CSC*, 330 U. S. 127 (1947), the Court upheld Congress' power to attach conditions to grants-in-aid received by the States, although the condition under attack involved an activity that "the United States is not concerned with, and has no power to regulate." *Id.*, at 143. The Tenth Amendment, the Court declared, "has been consistently construed 'as not depriving the national government of authority to resort to all means for the exercise of a granted power which are appropriate and plainly adapted to the permitted end,'" *ibid.*, quoting *United States* v. *Darby*, 312 U. S. 100, 124 (1941)—the end there being the disbursement of federal funds. Thus it cannot be constitutionally determinative that the federal regulation is likely to move the States to act in a given way, or even to "coerc[e] the States" into assuming a regulatory role by affecting their "freedom to make decisions in areas of 'integral governmental functions.'" *Hodel* v. *Virginia Surface Mining & Recl. Assn., Inc.*, 452 U. S., at 289.

Equally as important, it has always been the law that state legislative and judicial decisionmakers must give preclusive effect to federal enactments concerning nongovernmental activity, no matter what the strength of the competing local interests. See *Martin* v. *Hunter's Lessee*, 1 Wheat., at 340–341. This requirement follows from the nature of gov-

ernmental regulation of private activity. "[I]ndividual businesses necessarily [are] subject to the dual sovereignty of the government of the Nation and of the State in which they reside," *National League of Cities* v. *Usery*, 426 U. S., at 845; when regulations promulgated by the sovereigns conflict, federal law necessarily controls. This is true though Congress exercises its authority "in a manner that displaces the States' exercise of their police powers," *Hodel* v. *Virginia Surface Mining & Recl. Assn., Inc.*, 452 U. S., at 291, or in such a way as to "curtail or prohibit the States' prerogatives to make legislative choices respecting subjects the States may consider important," *id.*, at 290—or, to put it still more plainly, in a manner that is "extraordinarily intrusive." *Id.*, at 305 (POWELL, J., concurring). Thus it may be unlikely that the States will or easily can abandon regulation of public utilities to avoid PURPA's requirements. But this does not change the constitutional analysis: as in *Hodel* v. *Virginia Surface Mining & Recl. Assn.*, "[t]he most that can be said is that the . . . Act establishes a program of cooperative federalism that allows the States, within limits established by federal minimum standards, to enact and administer their own regulatory programs, structured to meet their own particular needs." *Id.*, at 289.[30]

---

[30] JUSTICE O'CONNOR's partial dissent suggests that our analysis is an "absurdity," *post*, at 781, and variously accuses us of "conscript[ing] state utility commissions into the national bureaucratic army," of transforming state legislative bodies into "field offices of the national bureaucracy," of approving the "dismemberment of state government," of making state agencies "bureaucratic puppets of the Federal Government," and—most colorfully—of permitting "Congress to kidnap state utility commissions." *Post*, at 775, 777, 782, 783, 790. While these rhetorical devices make for absorbing reading, they unfortunately are substituted for useful constitutional analysis. For while JUSTICE O'CONNOR articulates a view of state sovereignty that is almost mystical, she entirely fails to address our central point.

The partial dissent does not quarrel with the propositions that Congress may pre-empt the States in the regulation of private conduct, that Con-

To be sure, PURPA gives virtually any affected person the right to compel consideration of the statutory standards through judicial action. We fail to see, however, that this places any particularly onerous burden on the State. Mississippi by statute already grants *"[a]ny interested person . . .* the right to petition the [Public Service] [C]ommission for issuance, amendment or repeal of a rule or regulation," Miss. Code Ann. § 77–3–45 (1973) (emphasis added), and provides that *"any party* aggrieved by any final finding, order or judgment of the commission shall have the right, regardless of the amount involved, of appeal in chancery court." Miss. Code Ann. § 77–3–67(1) (Supp. 1981) (emphasis added). Indeed, "[a]ny person whose rights may be directly affected by said appeal may appear and become a party . . . ." *Ibid.* And

gress may condition the validity of State enactments in a pre-emptible area on their conformity with federal law, and that Congress may attempt to "coerce" the States into enacting nationally desirable legislation. Given this, the partial dissent fails to identify precisely what is "absurd" about a scheme that gives the States a choice between regulating in conformity with federal requirements, or abandoning regulation in a given field. Though the partial dissent finds *Hodel* v. *Virginia Surface Mining & Recl. Assn.* inapposite, in our view the parallel is striking: there, the States were directed to legislate consistently with congressional enactments, or not at all; here, the States are asked to regulate in conformity with federal requirements, or not at all. While it is true that PURPA conditions continued state regulatory activity on the performance of certain affirmative tasks, the partial dissent nowhere explains why—so long as the field is preemptible—the nature of the condition is relevant. And while PURPA's requirements in practice may be more intrusive and more difficult for the States to avoid than was the legislation at issue in *Hodel* v. *Virginia Surface Mining & Recl. Assn.,* JUSTICE O'CONNOR herself acknowledges that an "evaluation of intrusiveness . . . is simply irrelevant to the constitutional inquiry." *Post,* at 785–786. Similarly, the difference between PURPA and the Surface Mining Control and Reclamation Act of 1977 identified by the partial dissent cannot be that only the former affects a "traditional function of state government," *post,* at 781, for regulation of land use is perhaps the quintessential state activity. In short, while the area of state action potentially foreclosed by PURPA may be broader than was the case in *Hodel,* the partial dissent has pointed to no constitutionally significant theoretical distinction between the two statutory schemes.

"[a]ppeals in accordance with law may be had to the supreme court of the State of Mississippi from any final judgment of the chancery court." Miss. Code Ann. § 77–3–71 (1973).

It is hardly clear on the statute's face, then, that PURPA's standing and appeal provisions grant any rights beyond those presently accorded by Mississippi law, and appellees point to no specific provision of the Act expanding on the State's existing, liberal approach to public participation in ratemaking.[31] In this light, we again find the principle of *Testa* v. *Katt, supra,* controlling: the State is asked only to make its administrative tribunals available for the vindication of federal as well as state-created rights. PURPA, of course, establishes as federal policy the requirement that state commissions consider various ratemaking standards, and it gives individuals a right to enforce that policy; once it is established that the requirement is constitutionally supportable, "the obligation of states to enforce these federal laws is not lessened by reason of the form in which they are cast or the remedy which they provide." *Testa* v. *Katt,* 330 U. S., at 391. See *Second Employers' Liability Cases,* 223 U. S. 1, 57 (1912).

In short, Titles I and III do not involve the compelled exercise of Mississippi's sovereign powers. And, equally important, they do not set a mandatory agenda to be considered in all events by state legislative or administrative decisionmakers. As we read them, Titles I and III simply establish requirements for continued state activity in an otherwise preemptible field.[32] Whatever the constitutional problems as-

---

[31] We believe that this seemingly precise parallel between state and federal procedures suffices to overcome JUSTICE POWELL's objections to PURPA, at *least* where, as here, the statute is subjected to a facial attack. See also n. 34, *infra.*

[32] JUSTICE O'CONNOR's partial dissent accuses us of undervaluing *National League of Cities,* and maintains that our analysis permits Congress to "dictate the agendas and meeting places of state legislatures." *Post,* at 782. These apocalyptic observations, while striking, are overstated and patently inaccurate. We hold only that Congress may impose conditions

sociated with more intrusive federal programs, the "mandatory consideration" provisions of Titles I and III must be validated under the principle of *Hodel* v. *Virginia Surface Mining & Recl. Assn.*[33]

C. The Procedural Requirements. Titles I and III also require state commissions to follow certain notice and comment procedures when acting on the proposed federal standards. In a way, these appear more intrusive than the "consideration" provisions; while the latter are essentially hortatory, the procedural provisions obviously are prescriptive. Appellants and *amici* Maryland et al. argue that the procedural requirements simply establish minimum due process standards, something Mississippi appears already to provide,[34] and therefore may be upheld as an exercise of Con-

on the State's regulation of private conduct in a pre-emptible area. This does not foreclose a Tenth Amendment challenge to federal interference with the State's ability "to structure employer-employee relationships," 426 U. S., at 851, while providing "those governmental services which [its] citizens require," *id.*, at 847, as was the case in *National League of Cities*. It does not suggest that the Federal Government may impose conditions on state activities in fields that are not pre-emptible, or that are solely of intrastate concern. And it does not purport to authorize the imposition of general affirmative obligations on the States.

[33] As we note above, PURPA imposes certain reporting requirements on state commissions. But because these attach only if the State chooses to continue its regulatory efforts in the field, we find them supportable for the reasons addressed in connection with the other provisions of Titles I and III. Appellees nevertheless suggest that PURPA's requirements must fall because compliance will impose financial burdens on the States. We are unconvinced: in a Tenth Amendment challenge to congressional activity, "the determinative factor . . . [is] the nature of the federal action, not the ultimate economic impact on the States." *Hodel* v. *Virginia Surface Mining & Recl. Assn., Inc.*, 452 U. S., at 292, n. 33. In any event, Congress has taken steps to reduce or eliminate the economic burden of compliance. See n. 14, *supra*.

[34] Mississippi law provides for reasonable notice in the fixing of rates and conditions of service of utilities. Miss. Code Ann. § 77–3–33(2) (1973). It also requires the Public Service Commission to keep a "full and complete record" of all proceedings, § 77–3–63, and to "make and file its findings and order, and its opinion, if any," § 77–3–59. Indeed, the state statute re-

gress' Fourteenth Amendment powers. We need not go that far, however, for we uphold the procedural requirements under the same analysis employed above in connection with the "consideration" provisions. If Congress can require a state administrative body to consider proposed regulations as a condition to its continued involvement in a pre-emptible field—and we hold today that it can—there is nothing unconstitutional about Congress' requiring certain procedural minima as that body goes about undertaking its tasks. The procedural requirements obviously do not compel the exercise of the State's sovereign powers, and do not purport to set standards to be followed in all areas of the state commission's endeavors.

The judgment of the District Court is reversed.

*It is so ordered.*

JUSTICE POWELL, concurring in part and dissenting in part.

The Public Utility Regulatory Policies Act of 1978, Pub. L. 95–617, 92 Stat. 3117 *et seq.* (PURPA), imposes unprecedented burdens on the States. As JUSTICE O'CONNOR ably demonstrates, it intrusively requires them to make a place on their administrative agenda for consideration and potential adoption of federally proposed "standards." The statute does not simply ask States to consider quasi-legislative matters that Congress believes they would do well to adopt. It also prescribes administrative and judicial procedures that States must follow in deciding whether to adopt the proposed standards. At least to this extent, I think the PURPA violates the Tenth Amendment.

quires that "[a]ll findings of the commission and the determination of every matter by it shall be in writing and placed upon its minutes." § 77–1–41. These "shall be deemed a public record, and shall at all seasonable times be subject to the inspection of the public." *Ibid.* Thus, the requirements that appellees characterize as an extraordinary burden on the State appear to accord few, if any, procedural rights not already established by Mississippi law.

I

Most, if not all, of the States have administrative bodies—usually commissions—that regulate electric and gas public utility companies. As these utilities normally are given monopoly jurisdiction, they are extensively regulated both substantively and procedurally by state law. Until now, with limited exceptions, the Federal Government has not attempted to pre-empt this important state function, and certainly has not undertaken to prescribe the procedures by which state regulatory bodies make their decisions. The PURPA, for the first time, breaks with this longstanding deference to principles of federalism.

Now, regardless of established procedures before state administrative regulatory agencies and of state law with respect to judicial review, the PURPA forces federal procedures on state regulatory institutions. The PURPA prescribes rules directing that "the Secretary [of Energy], any affected electric utility, or any electric consumer of an affected electric utility may intervene and participate as a matter of right" in regulatory proceedings required by the PURPA respecting electrical rates.[1] It directs that "[a]ny person (including the Secretary) may bring an action to enforce" the obligations with respect to electrical rate consideration that the PURPA lays upon state regulatory commissions.[2] The statute provides that "[a]ny person (including

[1] 16 U. S. C. § 2631(a) (1976 ed., Supp. IV). "[A]ny electric utility or electric consumer" may enforce its intervention and participation rights in federal court. § 2633(b)(2). See also § 2633(b)(1).

The PURPA grants similar intervention and participation rights to the Secretary with respect to state natural gas utility rate proceedings. See 15 U. S. C. § 3205 (1976 ed., Supp. IV). These rights also are specified to be enforceable in federal court. See § 3207(a)(2).

[2] 16 U. S. C. § 2633(c)(1) (1976 ed., Supp. IV). A similar enforcement right is granted in the case of natural gas rate proceedings. 15 U. S. C. § 3207(b)(1) (1976 ed., Supp. IV).

Under the PURPA's Title II, § 210, States must implement federal rules relating to the interconnection of electrical utilities with qualifying cogeneration and small power production facilities. 16 U. S. C. § 824a–3

the Secretary) may obtain [judicial] review of any determination" made by a state regulatory commission regarding the PURPA's electrical rate policies.[3] The foregoing requirements by the PURPA intrude upon—in effect pre-empt—core areas of a State's administrative and judicial procedure.

## II

In sustaining these provisions of the Act, the Court reasons that Congress can condition the utility regulatory activities of States on any terms it pleases since, under the Commerce Clause, Congress has the power to pre-empt completely all such activities. *Ante*, at 765–766. Under this "threat of pre-emption" reasoning, Congress—one supposes —could reduce the States to federal provinces. But as *National League of Cities* v. *Usery*, 426 U. S. 833, 841 (1976), stated, and indeed as the structure of the Court's opinion today makes plain, *ante*, at 753 and 758, the Commerce Clause and the Tenth Amendment embody distinct limitations on federal power. That Congress has satisfied the one demonstrates nothing as to whether Congress has satisfied the other.[4]

_____

(1976 ed., Supp. IV). The Federal Energy Regulatory Commission and (under certain conditions) "[a]ny electrical utility, qualifying cogenerator, or qualifying small power producer" may bring judicial actions against state regulatory commissions to require the implementation of the federal rules prescribed by the PURPA. §§ 824a–3(h)(2)(A) and (B).

[3] 16 U. S. C. § 2633(c)(1) (1976 ed., Supp. IV). The PURPA also makes available a right of judicial review in the same manner with respect to the interconnection of electrical utilities with cogeneration and small power production facilities. § 824a–3(g)(1). No similar right is available in the case of natural gas rate proceedings. See 15 U. S. C. § 3207(b)(2) (1976 ed., Supp. IV).

As a separate matter, the PURPA specifies the procedural requirements for the state regulatory agencies' consideration and determination of the PURPA's federally proposed standards. See § 3203(c); 16 U. S. C. § 2621(b)(1) (1976 ed., Supp. IV).

[4] The Court cites *Testa* v. *Katt*, 330 U. S. 386 (1947), in support of the proposition that under some conditions the Federal Government may call

"The general rule, bottomed deeply in belief in the importance of state control of state judicial procedure, is that federal law takes the state courts as it finds them." Hart, The Relations Between State and Federal Law, 54 Colum. L. Rev. 489, 508 (1954). I believe the same principle must apply to other organs of state government. It may be true that the procedural provisions of the PURPA that prompt this dissent may not effect dramatic changes in the laws and procedures of some States. But I know of no other attempt by the Federal Government to supplant state-prescribed procedures that in part define the nature of their administrative agencies. If Congress may do this, presumably it has the power to pre-empt state-court rules of civil procedure and judicial review in classes of cases found to affect commerce. This would be the type of gradual encroachment hypothesized by Professor Tribe: "Of course, no one expects Congress to obliterate the states, at least in one fell swoop. If

---

upon state governmental institutions to decide matters of federal policy. But *Testa* recognized that, when doing so, Congress must respect the state institution's own decisionmaking structure and method. That opinion limited its holding to circumstances under which the state court has "jurisdiction adequate and appropriate *under established local law* to adjudicate this [federal] action." *Id.*, at 394 (emphasis added). The *Testa* Court then emphasized its meaning by citing *Herb* v. *Pitcairn*, 324 U. S. 117 (1945), where the Court stated that "[i]t would not be open to us" to insist on adjudication in a state court of a federal claim arising beyond the jurisdiction of the local court. *Id.*, at 121. See Note, Utilization of State Courts to Enforce Federal Penal and Criminal Statutes: Development in Judicial Federalism, 60 Harv. L. Rev. 966, 971 (1947) (nothing in *Testa* upsets "the traditional doctrine that Congress may not interfere with a state's sovereign right to determine and control the jurisdictional requirements of its own courts").

The Court also cites *Washington* v. *Washington State Commercial Passenger Fishing Vessel Assn.*, 443 U. S. 658 (1979), to support its holding. *Ante*, at 762. The case stands for the unremarkable proposition that a district court, after adjudicating a contest under federal law between a State and Indian tribes over fishing rights, may order the losing State to abide by the court's decision. Nothing in our *Fishing Vessel Assn.* opinion authorized the federal court to amend the structure of a state political institution.

there is any danger, it lies in the tyranny of small decisions—in the prospect that Congress will nibble away at state sovereignty, bit by bit, until someday essentially nothing is left but a gutted shell." [5]

I limit this dissent to the provisions of the PURPA identified above. Despite the appeal—and indeed wisdom—of JUSTICE O'CONNOR's evocation of the principles of federalism, I believe precedents of this Court support the constitutionality of the substantive provisions of this Act on this facial attack. See *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264 (1981); *Testa* v. *Katt*, 330 U. S. 386 (1947). Accordingly, to the extent the procedural provisions may be separable, I would affirm in part and reverse in part.

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE and JUSTICE REHNQUIST join, concurring in the judgment in part and dissenting in part.

I agree with the Court that the Commerce Clause supported Congress' enactment of the Public Utility Regulatory Policies Act of 1978, Pub. L. 95–617, 92 Stat. 3117 (PURPA). I disagree, however, with much of the Court's Tenth Amendment analysis. Titles I and III of PURPA conscript state utility commissions into the national bureaucratic army. This result is contrary to the principles of *National League of Cities* v. *Usery*, 426 U. S. 833 (1976), antithetical to the values of federalism, and inconsistent with our constitutional history. Accordingly, I dissent from Parts IV–B and IV–C of the Court's opinion. [1]

---

[5] L. Tribe, American Constitutional Law 302 (1978).

[1] I concur in the Court's decision to uphold Title II, § 210, of PURPA against appellees' facial attack. As the Court explains, part of that section permits the Federal Energy Regulatory Commission (FERC) to exempt cogeneration and small power production facilities from otherwise applicable state and federal laws. 16 U. S. C. § 824a–3(e) (1976 ed., Supp. IV). This exemption authority does not violate the Tenth Amendment, for it merely pre-empts state control of private conduct, rather than regulating

## I

Titles I and III of PURPA require state regulatory agencies to decide whether to adopt a dozen federal standards governing gas and electric utilities.[2]  The statute describes, in some detail, the procedures state authorities must fol-

the "States as States."  See *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U. S. 264, 287–293 (1981).

Section 210's requirement that the States "implement" rules promulgated by the Secretary of Energy, 16 U. S. C. § 824a–3(f) (1976 ed., Supp. IV), is more disturbing.  Appellants, however, have interpreted this statutory obligation to include "an undertaking to resolve disputes between qualifying facilities and electric utilities arising under [§ 210], or any other action reasonably designed to implement [that section]."  18 CFR § 292.401(a) (1981).  It appears, therefore, that state regulatory authorities may satisfy § 210's implementation requirement simply by adjudicating private disputes arising under that section.  As the Court points out, *ante,* at 760–761, the Mississippi Public Service Commission has jurisdiction over similar state disputes, and it is settled that a State may not exercise its judicial power in a manner that discriminates between analogous federal and state causes of action.  See *Testa* v. *Katt,* 330 U. S. 386 (1947).  Under these circumstances, but without foreclosing the possibility that particular applications of § 210's implementation provision might uncover hidden constitutional defects, I would not sustain appellees' facial attack on the provision.

Section 210 also authorizes FERC, electric utilities, cogenerators, and small power producers to "enforce" the above implementation provision against state utility commissions.  16 U. S. C. § 824a–3(h)(2) (1976 ed., Supp. IV).  As applied, it is conceivable that this enforcement provision would raise troubling federalism issues.  Once again, however, I decline to accept appellees' facial challenge to the provision, preferring to consider the constitutionality of this provision in the setting of a concrete controversy.

[2] The statute imposes the same requirements upon nonregulated utilities.  In this respect, it regulates purely private conduct and does not violate the Tenth Amendment.  Throughout this dissent, I consider only the constitutionality of Titles I and III as applied to state regulatory authorities.  I would allow the District Court, on remand, to decide whether the constitutionally defective aspects of Titles I and III are severable from the unobjectionable portions.

low when evaluating these standards,[3] but does not compel the States to adopt the suggested federal standards. 15 U. S. C. § 3203(a) (1976 ed., Supp. IV); 16 U. S. C. §§ 2621 (a), 2623(a), 2627(b) (1976 ed., Supp. IV). The latter, deceptively generous feature of PURPA persuades the Court that the statute does not intrude impermissibly into state sovereign functions. The Court's conclusion, however, rests upon a fundamental misunderstanding of the role that state governments play in our federalist system.

State legislative and administrative bodies are not field offices of the national bureaucracy. Nor are they think tanks to which Congress may assign problems for extended study. Instead, each State is sovereign within its own domain, governing its citizens and providing for their general welfare. While the Constitution and federal statutes define the boundaries of that domain, they do not harness state power for national purposes. The Constitution contemplates "an indestructible Union, composed of indestructible States," a system in which both the State and National Governments retain a "separate and independent existence." *Texas* v.

---

[3] See *ante*, at 748–749. The Court overlooks several of PURPA's procedural mandates. For example, with respect to six of the standards, the state agency must publish a written determination, including findings, even if it decides to adopt the federal standard. 16 U. S. C. § 2621(b) (1976 ed., Supp. IV). In addition, PURPA guarantees certain rights to discover information, § 2631(b); requires the State to provide transcripts, at the cost of reproduction, to parties to ratemaking proceedings or other "regulatory proceeding[s] relating to [electric utility] rates or rate design," § 2632(c); and, under some circumstances, mandates compensation for reasonable attorney's fees, expert witness fees, and other costs to consumers who contribute substantially to the adoption of a Title I standard, §§ 2632 (a), (b). These requirements, as well as the ones described by the Court, may impose special burdens on state administrative agencies. I do not weigh the constitutionality of these individual procedural requirements, however, because I would invalidate the entire regimen that Titles I and III impose on state regulatory authorities.

*White,* 7 Wall. 700, 725 (1869); *Lane County* v. *Oregon,* 7 Wall. 71, 76 (1869).

Adhering to these principles, the Court has recognized that the Tenth Amendment restrains congressional action that would impair "a state's ability to function as a state." *Transportation Union* v. *Long Island R. Co.,* 455 U. S. 678, 686 (1982); *National League of Cities* v. *Usery,* 426 U. S., at 842–852; *Fry* v. *United States,* 421 U. S. 542, 547, n. 7 (1975). See also *Lafayette* v. *Louisiana Power & Light Co.,* 435 U. S. 389, 423–424 (1978) (BURGER, C. J., concurring in judgment). For example, in *National League of Cities* v. *Usery, supra,* the Court held that Congress could not prescribe the minimum wages and maximum hours of state employees engaged in "traditional governmental functions," *id.,* at 852, because the power to set those wages and hours is an "attribute of state sovereignty" that is "'essential to [a] separate and independent existence.'" *Id.,* at 845 (quoting *Lane County* v. *Oregon, supra,* at 76).

Just last Term this Court identified three separate inquiries underlying the result in *National League of Cities.* A congressional enactment violates the Tenth Amendment, we observed, if it regulates the "'States as States,'" addresses "matters that are indisputably 'attribute[s] of state sovereignty,'" and "directly impair[s] [the States'] ability to 'structure integral operations in areas of traditional governmental functions.'" *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U. S. 264, 287–288 (1981) (quoting *National League of Cities, supra,* at 854, 845, 852). See also *Transportation Union, supra,* at 684.[4]

Application of these principles to the present case reveals the Tenth Amendment defects in Titles I and III. Plainly

---

[4] In both *Hodel* and *United Transportation Union* we further noted that, even when these three requirements are met, "the nature of the federal interest advanced may be such that it justifies state submission." *Hodel,* 452 U. S., at 288, n. 29; *Transportation Union,* 455 U. S., at 684, n. 9. Neither of those cases involved such an exception to *National League of Cities,* and the Court has not yet explored the circumstances that might justify such an exception.

those Titles regulate the "States as States." While the statute's ultimate aim may be the regulation of private utility companies, PURPA addresses its commands solely to the States. Instead of requesting private utility companies to adopt lifeline rates, declining block rates, or the other PURPA standards, Congress directed state agencies to appraise the appropriateness of those standards. It is difficult to argue that a statute structuring the regulatory agenda of a state agency is not a regulation of the "State."

I find it equally clear that Titles I and III address "attribute[s] of state sovereignty." Even the Court recognizes that "the power to make decisions and to set policy is what gives the State its sovereign nature." *Ante*, at 761. The power to make decisions and set policy, however, embraces more than the ultimate authority to enact laws; it also includes the power to decide which proposals are most worthy of consideration, the order in which they should be taken up, and the precise form in which they should be debated. PURPA intrudes upon all of these functions. It chooses 12 proposals, forcing their consideration even if the state agency deems other ideas more worthy of immediate attention. In addition, PURPA hinders the agency's ability to schedule consideration of the federal standards.[5] Finally, PURPA specifies, with exacting detail, the content of the standards that will absorb the agency's time.[6]

---

[5] As the Court recognizes, *ante*, at 748, PURPA permits "[a]ny person" to bring an action in state court to enforce the agency's obligation to consider the federal standards. 15 U. S. C. § 3207(b)(1) (1976 ed., Supp. IV); 16 U. S. C. § 2633(c)(1) (1976 ed., Supp. IV). The Secretary of Energy, moreover, may intervene in any ongoing ratemaking proceeding to require consideration of PURPA's standards. 15 U. S. C. § 3205(a) (1976 ed., Supp. IV); 16 U. S. C. §§ 2631(a), 2622(a) (1976 ed., Supp. IV). Title I grants affected utilities and consumers the same right of intervention. 16 U. S. C. § 2631(a) (1976 ed., Supp. IV). Because of these rights of intervention and enforcement, state agencies lack even the power to schedule their consideration of PURPA's standards.

[6] For example, the proposed standards governing advertising provide that "[n]o electric [or gas] utility may recover from any person other than

If Congress routinely required the state legislatures to debate bills drafted by congressional committees, it could hardly be questioned that the practice would affect an attribute of state sovereignty.   PURPA, which sets the

---

the shareholders (or other owners) of such utility any direct or indirect expenditure by such utility for promotional or political advertising as [further] defined in . . . this title."   16 U. S. C. § 2623(b)(5) (1976 ed., Supp. IV); 15 U. S. C. § 3203(b)(2) (1976 ed., Supp. IV).   PURPA then defines the terms "advertising," "political advertising," and "promotional advertising":

"(1) For purposes of this section and section 2623(b)(5) of this title—

"(A) The term 'advertising' means the commercial use, by an electric utility, of any media, including newspaper, printed matter, radio, and television, in order to transmit a message to a substantial number of members of the public or to such utility's electric consumers.

"(B) The term 'political advertising' means any advertising for the purpose of influencing public opinion with respect to legislative, administrative, or electoral matters, or with respect to any controversial issue of public importance.

"(C) The term 'promotional advertising' means any advertising for the purpose of encouraging any person to select or use the service or additional service of an electric utility or the selection or installation of any appliance or equipment designed to use such utility's service.

"(2) For purposes of this subsection and section 2623(b)(5) of this title, the terms 'political advertising' and 'promotional advertising' do not include—

"(A) advertising which informs electric consumers how they can conserve energy or can reduce peak demand for electric energy,

"(B) advertising required by law or regulation, including advertising required under part 1 of title II of the National Energy Conservation Policy Act . . . ,

"(C) advertising regarding service interruptions, safety measures, or emergency conditions,

"(D) advertising concerning employment opportunities with such utility,

"(E) advertising which promotes the use of energy efficient appliances, equipment or services, or

"(F) any explanation or justification of existing or proposed rate schedules, or notifications of hearings thereon."   16 U. S. C. § 2625(h) (1976 ed., Supp. IV).

See also 15 U. S. C. § 3204(b) (1976 ed., Supp. IV) (containing similar provisions for gas utilities).

agendas of agencies exercising delegated legislative power in a specific field, has a similarly intrusive effect.

Finally, PURPA directly impairs the States' ability to "structure integral operations in areas of traditional governmental functions." Utility regulation is a traditional function of state government,[7] and the regulatory commission is the most integral part of that function. By taxing the limited resources of these commissions, and decreasing their ability to address local regulatory ills, PURPA directly impairs the power of state utility commissions to discharge their traditional functions efficiently and effectively.[8]

The Court sidesteps this analysis, suggesting that the States may escape PURPA simply by ceasing regulation of public utilities. Even the Court recognizes that this choice "may be a difficult one," *ante*, at 766, and that "it may be unlikely that the States will or easily can abandon regulation of public utilities to avoid PURPA's requirements." *Ante*, at 767. In fact, the Court's "choice" is an absurdity, for if its analysis is sound, the Constitution no longer limits federal regulation of state governments. Under the Court's analysis, for example, *National League of Cities* v. *Usery*, 426

---

[7] The Court has not explored fully the extent of "traditional" state functions. Utility regulation, however, should fall within any definition of that term. See generally W. Jones, Cases and Materials on Regulated Industries 25–44 (2d ed. 1976) (tracing history of state regulation of utilities).

[8] PURPA thus offends each of the criteria named in *Hodel*. I do not believe, moreover, that this is a case in which "the nature of the federal interest advanced may be such that it justifies state submission." See n. 4, *supra*. Whatever the ultimate content of that standard, it must refer not only to the weight of the asserted federal interest, but also to the necessity of vindicating that interest in a manner that intrudes upon state sovereignty. In this case, the Government argues that PURPA furthers vital national interests in energy conservation. Although the congressional goal is a noble one, appellants have not shown that Congress needed to commandeer state utility commissions to achieve its aim. Consistent with the Tenth Amendment, Congress could have assigned PURPA's tasks to national officials. Alternatively, it could have requested state commissions to comply with Titles I and III and directed the Secretary to shoulder the burden of any State choosing not to comply.

U. S. 833 (1976), would have been wrongly decided, because the States could have avoided the Fair Labor Standards Act by "choosing" to fire all employees subject to that Act and to close those branches of state government.[9]   Similarly, Congress could dictate the agendas and meeting places of state legislatures, because unwilling States would remain free to abolish their legislative bodies.[10]   I do not agree that this dismemberment of state government is the correct solution to a Tenth Amendment challenge.

The choice put to the States by the Surface Mining Control and Reclamation Act of 1977, 91 Stat. 447, 30 U. S. C. § 1201 *et seq.* (1976 ed., Supp. IV), the federal statute upheld in

---

[9] The Court attempts to distinguish *National League of Cities*, suggesting that it involved "the State's ability 'to structure employer-employee relationships,' . . . while providing 'those governmental services which [its] citizens require.'" *Ante*, at 770, n. 32 (quoting *National League of Cities*, 426 U. S., at 851, 847).   This case, the Court declares, "hold[s] only that Congress may impose conditions on the State's regulation of private conduct in a pre-emptible area." *Ante*, at 769–770, n. 32.   The Court, however, does not explain why our *National League of Cities* opinion did not consider compliance with the Fair Labor Standards Act in fields such as "licensing of occupations and businesses, . . . preservation of environmental quality, . . . [and] protection of the public against fraud and sharp practice," App. in *National League of Cities* v. *Usery*, O. T. 1975, No. 74–878, p. 16 (reprinting complaint), a "conditio[n] on the State's regulation of private conduct in a pre-emptible area."   In that case, Congress had required the States to pay their employees specified amounts if they wished to continue regulating a variety of pre-emptible fields.   Here, it has required the States to burden their officials with evaluation of a dozen legislative proposals if they wish to continue regulating private utilities.   To me, the parallel is obvious, not "overstated." *Ante*, at 769, n. 32.

I am nevertheless confident that, as the Court itself stresses, *ibid.*, today's decision is not intended to overrule *National League of Cities*.   Instead, the novelty of PURPA's scheme, see *ante*, at 758–759, merely seems to have obscured the relevance of *National League of Cities* to this case.

[10] But cf. *Coyle* v. *Oklahoma*, 221 U. S. 559, 565 (1911) ("The power to locate its own seat of government and to determine when and how it shall be changed from one place to another . . . are essentially and peculiarly state powers.   That one of the . . . States could now be shorn of such powers by an act of Congress would not be for a moment entertained").

*Hodel* v. *Virginia Surface Mining & Reclamation Assn.,
Inc.,* 452 U. S. 264 (1981), and discussed by the Court, *ante,*
at 764–765, 768, n. 30, is quite different from the decision
PURPA mandates. The Surface Mining Act invites the
States to submit proposed surface mining regulations to the
Secretary of the Interior. 30 U. S. C. § 1253 (1976 ed.,
Supp. IV). If the Secretary approves a state regulatory
program, then the State enforces that program. If a State
chooses not to submit a program, the Secretary develops and
implements a program for that State. § 1254. Even States
in the latter category, however, may supplement the Secre-
tary's program with consistent state laws.[11] The Surface
Mining Act does not force States to choose between perform-
ing tasks set by Congress and abandoning all mining or land
use regulation. That statute is "a program of cooperative
federalism," *Hodel, supra,* at 289, because it allows the
States to choose either to work with Congress in pursuit of
federal surface mining goals or to devote their legislative re-
sources to other mining and land use problems. By contrast,
there is nothing "cooperative" about a federal program that
compels state agencies either to function as bureaucratic pup-
pets of the Federal Government or to abandon regulation of
an entire field traditionally reserved to state authority.[12]

---

[11] Title 30 U. S. C. § 1254(g) (1976 ed., Supp. IV) only pre-empts state
laws "insofar as they interfere with the achievement of the purposes and
the requirements of this chapter and the Federal program." Similarly,
§ 1255(a) provides that no state law or regulation "shall be superseded by
any provision of this chapter or any regulation issued pursuant thereto, ex-
cept insofar as such State law or regulation is inconsistent with the provi-
sions of this chapter." Section 1255(b) explains that neither state laws
that are more stringent than the federal standards nor state laws govern-
ing operations "for which no provision is contained in this chapter" are "in-
consistent" with the congressional Act.

[12] As one scholar has written: "A federal system implies a partnership, all
members of which are effective players on the team and all of whom retain
the capacity for independent action. It does not imply a system of col-
laboration in which one of the collaborators is annihilated by the other."
L. White, The States and the Nation 3 (1953).

Yet this is the "choice" the Court today forces upon the States.

The Court defends its novel decision to permit federal conscription of state legislative power by citing three cases upholding statutes that "in effect directed state decisionmakers to take or to refrain from taking certain actions." *Ante,* at 762. *Testa* v. *Katt,* 330 U. S. 386 (1947), is the most suggestive of these decisions.[13] In *Testa,* the Court held that state trial courts may not refuse to hear a federal claim if "th[e] same type of claim arising under [state] law would be enforced by that State's courts." *Id.,* at 394. A facile reading of *Testa* might suggest that state legislatures must also entertain congressionally sponsored business, as long as the federal duties are similar to existing state obligations. Application of *Testa* to legislative power, however, vastly expands the scope of that decision. Because trial courts of general jurisdiction do not choose the cases that they hear, the

---

[13] The other two decisions, *Fry* v. *United States,* 421 U. S. 542 (1975), and *Washington* v. *Washington State Commercial Passenger Fishing Vessel Assn.,* 443 U. S. 658 (1979), are readily distinguishable. *Fry* upheld a temporary wage freeze as applied to state and local governmental employees. As we subsequently observed, this emergency restraint "displaced no state choices as to how governmental operations should be structured, nor did it force the States to remake such choices themselves. Instead, it merely required that the wage scales and employment relationships which the States themselves had chosen be maintained during [a] period of . . . emergency." *National League of Cities* v. *Usery, supra,* at 853. In *Washington State Fishing Vessel Assn.,* state agencies were defendants to a suit charging violations of federal treaties, and we upheld the lower court's power to enforce its judgment by ordering the defendants to comply with federal law. The power of a court to enjoin adjudicated violations of federal law, however, is far different from the power of Congress to demand state legislative action in the absence of any showing that the State has violated existing federal duties. See Hart, The Relations Between State and Federal Law, 54 Colum. L. Rev. 489, 515–516 (1954); Salmon, The Federalist Principle: The Interaction of the Commerce Clause and the Tenth Amendment in the Clean Air Act, 2 Colum. J. Envtl. L. 290, 334–337 (1976).

requirement that they evenhandedly adjudicate state and federal claims falling within their jurisdiction does not infringe any sovereign authority to set an agenda.[14]   As explained above, however, the power to choose subjects for legislation is a fundamental attribute of legislative power, and interference with this power unavoidably undermines state sovereignty.   Accordingly, the existence of a congressional authority to "enlist . . . the [state] judiciary . . . to further federal ends," *ante*, at 762, does not imply an equivalent power to impress state legislative bodies into federal service.

The Court, finally, reasons that because Congress could have pre-empted the entire field of intrastate utility regulation, the Constitution should not forbid PURPA's "less intrusive scheme." *Ante*, at 765, and n. 29.[15]   The Court's eval-

---

[14] The Court suggests, *ante*, at 762–763, n. 27, that the requirement that state courts adjudicate federal claims may, as a practical matter, undermine the capacity of those courts to decide state controversies.   Whatever the force of that observation, it does not demonstrate *Testa's* relevance to this case.   State legislative bodies possess at least one attribute of sovereignty, the power to set an agenda, that trial courts lack.   This difference alone persuades me not to embrace the Court's expansion of *Testa.*

[15] The Court's suggestion is somewhat disingenuous because Congress concluded that federal pre-emption of the matters governed by Titles I and III would be inappropriate.   The administration's original proposal, as well as the version of PURPA approved by the House, would have pre-empted state law by establishing minimum federal ratemaking standards. See generally H. R. Conf. Rep. No. 95–1750, pp. 63–65 (1978); S. Conf. Rep. No. 95–1292, pp. 63–65 (1978).   The Senate Committee on Energy and Natural Resources, however, rejected this approach because

"the committee felt that setting minimum federal standards for utility rates, or mandating the use of certain costing methods for ratesetting, would be an unnecessary intrusion into an area which has traditionally been regulated by the States.   It was apparent to the committee that many State utility commissions are currently involved in innovative ratemaking and are working toward the goal of conservation of energy through rate reform.   At present, the State regulatory agencies rather than the Federal Government, possess the expertise to conduct the detailed costing and demand studies required to implement rate structure revision.   Moreover, the committee recognized that rate structures must re-

uation of intrusiveness, however, is simply irrelevant to the constitutional inquiry. The Constitution permits Congress to govern only through certain channels. If the Tenth Amendment principles articulated in *National League of Cities* v. *Usery*, 426 U. S. 833 (1976), and *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264 (1981), foreclose PURPA's approach, it is no answer to argue that Congress could have reached the same destination by a different route. This Court's task is to enforce constitutional limits on congressional power, not to decide whether alternative courses would better serve state and federal interests.[16]

I do not believe, moreover, that Titles I and III of PURPA are less intrusive than pre-emption.[17] When Congress pre-

---

flect the individual needs and local peculiarities of each utilities' service area . . . . Finally the committee felt that the potential uncertainty and delays accompanying Federal regulation threatened to have an adverse impact on the financial health of the utility industry which outweighed the projected savings in capital expenditures claimed by supporters of the administration's proposal." S. Rep. No. 95–442, p. 9 (1977).

See also 123 Cong. Rec. 32392–32393 (1977) (remarks of Sen. Johnston); *id.*, at 32394 (remarks of Sen. Domenici). The Senate version of PURPA, accordingly, eschewed the pre-emption route. See H. R. Conf. Rep. No. 95–1750, *supra*, at 65–66; S. Conf. Rep. No. 95–1292, *supra*, at 65–66. While the Conferees produced a compromise bill, they too stopped short of pre-emption. Today's decision, therefore, permits Congress to set state legislative agendas in a field that Congress might have occupied but expressly found unsuited to pre-emption.

[16] Justice Harlan once commented that times of "international unrest and domestic uncertainty" are "bound to produce temptations and pressures to depart from or temporize with traditional constitutional precepts or even to short-cut the processes of change which the Constitution establishes." Harlan, Thoughts at a Dedication: Keeping the Judicial Function in Balance, 49 A. B. A. J. 943 (1963). Justice Harlan then cautioned that it "[i]s . . . the special responsibility of lawyers, whether on or off the bench, to see to it that such things do not happen." *Ibid.*

[17] In 1975, then Attorney General Edward H. Levi responded to a similar argument that the "greater" power of pre-emption includes the "lesser" power of demanding affirmative action from state governments. Attorney General Levi remarked that "it is an insidious point to say that there is more federalism by compelling a State instrumentality to work for the Fed-

empts a field, it precludes only state legislation that conflicts with the national approach. The States usually retain the power to complement congressional legislation, either by regulating details unsupervised by Congress or by imposing requirements that go beyond the national threshold.[18] Most importantly, after Congress pre-empts a field, the States may simply devote their resources elsewhere. This country does not lack for problems demanding legislative attention. PURPA, however, drains the inventive energy of state governmental bodies by requiring them to weigh its detailed standards, enter written findings, and defend their determinations in state court. While engaged in these congressionally mandated tasks, state utility commissions are less able to pursue local proposals for conserving gas and electric power. The States might well prefer that Congress simply impose the standards described in PURPA; this, at least, would leave them free to exercise their power in other areas.

Federal pre-emption is less intrusive than PURPA's approach for a second reason. Local citizens hold their utility commissions accountable for the choices they make. Citizens, moreover, understand that legislative authority usually includes the power to decide which ideas to debate, as well as which policies to adopt. Congressional compulsion of state agencies, unlike pre-emption, blurs the lines of political accountability and leaves citizens feeling that their representatives are no longer responsive to local needs.[19]

The foregoing remarks suggest that, far from approving a minimally intrusive form of federal regulation, the Court's

---

eral Government." Hearings on S. 354 before the Senate Committee on Commerce, 94th Cong., 1st Sess., 503 (1975). In a similar vein, he warned against "lov[ing] the States to their demise." *Id.*, at 507.

[18] In rare instances, Congress so occupies a field that any state regulation is inconsistent with national goals. The Court, however, is reluctant to infer such expansive pre-emption "in the absence of persuasive reasons." *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142 (1963).

[19] See generally Stewart, Pyramids of Sacrifice? Problems of Federalism in Mandating State Implementation of National Environmental Policy, 86 Yale L. J. 1196, 1239–1247 (1977); Comment, Redefining the *National*

decision undermines the most valuable aspects of our federalism. Courts and commentators frequently have recognized that the 50 States serve as laboratories for the development of new social, economic, and political ideas.[20] This state innovation is no judicial myth. When Wyoming became a State in 1890, it was the only State permitting women to vote.[21] That novel idea did not bear national fruit for another 30 years.[22] Wisconsin pioneered unemployment insurance,[23]

---

*League of Cities* State Sovereignty Doctrine, 129 U. Pa. L. Rev. 1460, 1477–1478 (1981).

Daniel Elazar, testifying before the Advisory Commission on Intergovernmental Relations in March 1980, commented upon this problem of garbled political responsibility. He suggested that national officials tend to force state governments to administer unpopular programs, thus transferring political liability for those programs to the States. Advisory Commission on Intergovernmental Relations, The Federal Role in the Federal System: The Dynamics of Growth, Hearings on the Federal Role 32 (Oct. 1980). As an example, he cited the President's attempt in 1979 to force state Governors to establish and enforce unpopular gas rationing mechanisms. *Id.*, at 85 (formal statement of Professor Elazar).

[20] See, *e. g.*, *Chandler* v. *Florida*, 449 U. S. 560, 579 (1981); *Reeves, Inc.* v. *Stake*, 447 U. S. 429, 441 (1980); *Whalen* v. *Roe*, 429 U. S. 589, 597, and n. 20 (1977); *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 311 (1932) (Brandeis, J., dissenting); Hart, *supra* n. 13, at 540, 542; A. Macmahon, The Problems of Federalism: A Survey, in Federalism: Mature and Emergent 3, 10–11 (A. Macmahon ed., 1955); N. Rockefeller, The Future of Federalism 8–9 (1962); Stewart, *supra* n. 19, at 1210; White, *supra* n. 12, at 46–47.

[21] Wyoming's policy followed a practice it had adopted as a Territory. Compare Act of Jan. 21, 1891, ch. 100, § 4, 1890–1891 Wyo. Sess. Laws 394, with Act of Mar. 14, 1890, ch. 80, § 7, 1890 Wyo. Terr. Sess. Laws 158. See generally C. Beard & M. Beard, The Rise of American Civilization 563 (rev. ed. 1937).

[22] The Nineteenth Amendment, ratified in 1920, prohibits abridgment of the right to vote "on account of sex."

[23] See Act of Jan. 28, 1932, ch. 20, 1931–1932 Wis. Laws 57; Act of June 1, 1933, ch. 186, 1933 Wis. Laws 448; Act of June 2, 1933, ch. 194, 1933 Wis. Laws 491; W. Leuchtenburg, Franklin D. Roosevelt and the New Deal, 1932–1940, p. 130 (1963); Rockefeller, *supra* n. 20, at 16.

while Massachusetts initiated minimum wage laws for women and minors.[24] After decades of academic debate, state experimentation finally provided an opportunity to observe no-fault automobile insurance in operation.[25] Even in the field of environmental protection, an area subject to heavy federal regulation, the States have supplemented national standards with innovative and far-reaching statutes.[26] Utility regulation itself is a field marked by valuable state invention.[27] PURPA, which commands state agencies to spend their time evaluating federally proposed standards and defending their decisions to adopt or reject those standards, will retard this creative experimentation.

In addition to promoting experimentation, federalism enhances the opportunity of all citizens to participate in representative government. Alexis de Tocqueville understood well that participation in local government is a cornerstone of American democracy:

> "It is incontestably true that the love and the habits of republican government in the United States were engendered in the townships and in the provincial assemblies. [I]t is this same republican spirit, it is these manners and customs of a free people, which are engendered and nurtured in the different States, to be afterwards applied to

---

[24] See Act of June 4, 1912, ch. 706, 1912 Mass. Acts 780; R. Morris, Encyclopedia of American History 768 (bicentennial ed. 1976).

[25] See C. Morris & C. Morris, Jr., Morris on Torts 244–245 (2d ed. 1980); Friendly, Federalism: A Foreword, 86 Yale L. J. 1019, 1034 (1977).

[26] Florida, for example, has enacted particularly strict legislation against oil spills. Fla. Stat. §§ 376.011–376.21 (1974 and Supp. 1982). This Court upheld that legislation in *Askew* v. *American Waterways Operators, Inc.*, 411 U. S. 325 (1973).

[27] See *FPC* v. *East Ohio Gas Co.*, 338 U. S. 464, 489 (1950) (Jackson, J., dissenting) ("Long before the Federal Government could be stirred to regulate utilities, courageous states took the initiative and almost the whole body of utility practice has resulted from their experiences").

the country at large." 1 A. de Tocqueville, Democracy in America 181 (H. Reeve trans. 1961).[28]

Citizens, however, cannot learn the lessons of self-government if their local efforts are devoted to reviewing proposals formulated by a faraway national legislature. If we want to preserve the ability of citizens to learn democratic processes through participation in local government, citizens must retain the power to govern, not merely administer, their local problems.

Finally, our federal system provides a salutary check on governmental power. As Justice Harlan once explained, our ancestors "were suspicious of every form of all-powerful central authority." Harlan, *supra* n. 16, at 944. To curb this evil, they both allocated governmental power between state and national authorities, and divided the national power among three branches of government. Unless we zealously protect these distinctions, we risk upsetting the balance of power that buttresses our basic liberties. In analyzing this brake on governmental power, Justice Harlan noted that "[t]he diffusion of power between federal and state authority . . . takes on added significance as the size of the federal bureaucracy continues to grow." *Ibid.*[29] Today, the Court disregards this warning and permits Congress to kidnap state utility commissions into the national regulatory family. Whatever the merits of our national energy legislation, I am

---

[28] See also I. Silone, The School for Dictators 119 (W. Weaver trans. 1963) ("A regime of freedom should receive its lifeblood from the self-government of local institutions. When democracy, driven by some of its baser tendencies, suppresses such autonomies, it is only devouring itself. If in the factory the master's word is law, if bureaucracy takes over the trade union, if the central government's representative runs the city and the province, . . . then you can no longer speak of democracy").

[29] See also Stewart, *supra* n. 19, at 1241–1244 (discussing "political safeguards of federalism"); Rockefeller, *supra* n. 20, at 10.

not ready to surrender this state legislative power to the Federal Energy Regulatory Commission.

## II

As explained above, the Court's decision to uphold Titles I and III violates the principles of *National League of Cities* v. *Usery*, 426 U. S. 833 (1976), and threatens the values promoted by our federal system. The Court's result, moreover, is at odds with our constitutional history, which demonstrates that the Framers consciously rejected a system in which the National Legislature would employ state legislative power to achieve national ends.

The principal defect of the Articles of Confederation, 18th-century writers agreed, was that the new National Government lacked the power to compel individual action. Instead, the central government had to rely upon the cooperation of state legislatures to achieve national goals. Thus, Alexander Hamilton explained that "[t]he great and radical vice in the construction of the existing Confederation is in the principle of legislation for states or governments, in their corporate or collective capacities and as contradistinguished from the individuals of whom they consist." The Federalist No. 15, p. 93 (J. Cooke ed. 1961) (emphasis omitted). He pointed out, for example, that the National Government had "an indefinite discretion to make requisitions for men and money," but "no authority to raise either by regulations extending to the individual citizens of America." *Ibid.*

The Constitution cured this defect by permitting direct contact between the National Government and the individual citizen, a change repeatedly acknowledged by the delegates assembled in Philadelphia. George Mason, for example, declared:

> "Under the existing Confederacy, Congress represent[s] the *States* not the *people* of the States: their acts operate on the *States* not on the individuals. The case will be

changed in the new plan of Government." 1 The Records of the Federal Convention of 1787, p. 133 (M. Farrand ed. 1911) (hereinafter Farrand) (abbreviations expanded in this and subsequent quotations).

Hamilton subsequently explained to the people of New York that the Constitution marked the "difference between a league and a government," because it "extend[ed] the authority of the union to the persons of the citizens,—the only proper objects of government." The Federalist No. 15, *supra*, at 95. Similarly, Charles Pinckney told the South Carolina House of Representatives that "the necessity of having a government which should at once operate upon the people, and not upon the states, was conceived to be indispensable by every delegation present; . . . however they may have differed with respect to the quantum of power, no objection was made to the system itself." 4 Elliot's Debates on the Federal Convention 256 (2d ed. 1863).

The speeches and writings of the Framers suggest why they adopted this means of strengthening the National Government. Mason, for example, told the Convention that because "punishment could not [in the nature of things be executed on] the States collectively," he advocated a National Government that would "directly operate on individuals." 1 Farrand 34. Hamilton predicted that a National Government forced to work through the States would "degenerate into a military despotism" because it would have to maintain a "large army, continually on foot" to enforce its will against the States. The Federalist No. 16, p. 101 (J. Cooke ed. 1961). See also *id.*, at 102; The Federalist No. 15, *supra*, at 95–96.

Thus, the Framers concluded that government by one sovereign through the agency of a second cannot be satisfactory. At one extreme, as under the Articles of Confederation, such a system is simply ineffective. At the other, it requires a degree of military force incompatible with stable government

and civil liberty.[30] For this reason, the Framers concluded that "the execution of the laws of the national government . . . should not require the intervention of the State Legislatures," The Federalist No. 16, *supra*, at 103, and abandoned the Articles of Confederation in favor of direct national legislation.

At the same time that the members of the Constitutional Convention fashioned this principle, they rejected two proposals that would have given the National Legislature power to supervise directly state governments. The first proposal would have authorized Congress "to call forth the force of the Union against any member of the Union failing to fulfill its duty under the articles thereof." 1 Farrand 21. The delegates never even voted on this suggestion. James Madison moved to postpone it, stating that "the more he reflected on the use of force, the more he doubted the practicability, the justice and the efficacy of it when applied to people collectively and not individually." *Id.*, at 54. Several other delegates echoed his concerns,[31] and Madison ultimately reported that "[t]he practicability of making laws, with coercive sanc-

---

[30] Henry M. Hart, Jr., agreed that the Framers were well aware "of the delicacy, and the difficulties of enforcement, of affirmative mandates from a federal government to the governments of the member states." Hart, *supra* n. 13, at 515. Until the second half of this century, Congress apparently heeded this wisdom. "Federal law," Hart observed in 1954, "often says to the states, 'Don't do any of these things,' leaving outside the scope of its prohibition a wide range of alternative courses of action. But it is illuminating to observe how rarely it says, 'Do *this* thing,' leaving no choice but to go ahead and do it." *Ibid.*

[31] Governor Randolph of Virginia, for example, opposed a similar proposal for national coercion on the grounds that it was "impracticable, expensive, [and] cruel to individuals." Instead, he advocated "resort . . . to a national Legislation over individuals." 1 Farrand 256 (emphasis deleted). Mason eloquently argued that "[t]he most jarring elements of nature; fire & water themselves are not more incompatible that *[sic]* such a mixture of civil liberty and military execution." *Id.*, at 339.

tions, for the States as political bodies [has] been exploded on all hands." 2 *id.*, at 9.

The second proposal received more favorable consideration. Virginia's Governor Randolph suggested that Congress should have the power "to negative all laws passed by the several States, contravening in the opinion of the National Legislature the articles of Union." 1 *id.*, at 21. On May 31, 1787, the Committee of the Whole approved this proposal without debate. *Id.*, at 61. A week later, Pinckney moved to extend the congressional negative to all state laws "which [Congress] should judge to be improper." *Id.*, at 164. Numerous delegates criticized this attempt to give Congress unbounded control over state lawmaking. Hugh Williamson, for example, thought "the State Legislatures ought to possess independent powers in cases purely local," *id.*, at 171, while Elbridge Gerry thought Pinckney's idea might "enslave the States." *Id.*, at 165. After much debate, the Convention rejected Pinckney's suggestion.

Late in July, the delegates reversed their approval of even Randolph's more moderate congressional veto. Several delegates now concluded that the negative would be "terrible to the States," "unnecessary," and "improper." 2 *id.*, at 27.[32] Omission of the negative, however, left the new system without an effective means of adjusting conflicting state and national laws. To remedy this defect, the delegates adopted the Supremacy Clause, providing that the Federal Constitution, laws, and treaties are "the supreme Law of the Land" and that "the Judges in every State shall be bound

---

[32] Thomas Jefferson disapproved of the congressional veto as soon as he heard of it. Writing to Madison from Paris, he declared: "The negative proposed to be given [the national legislators] on all the acts of the several Legislatures is now for the first time suggested to my mind. Prima facie I do not like it." C. Warren, The Making of the Constitution 168 (1937). Notably, Jefferson suggested that "an appeal from the State Judicatures to a Federal Court, in all cases where the Act of Confederation controuled the question, [would] be as effectual a remedy." *Id.*, at 168–169.

thereby." Art. VI, cl. 2. Thus, the Framers substituted judicial review of state laws for congressional control of state legislatures.

While this history demonstrates the Framers' commitment to a strong central government, the means that they adopted to achieve that end are as instructive as the end itself.[33] Under the Articles of Confederation, the National Legislature operated through the States. The Framers could have fortified the central government, while still maintaining the same system, if they had increased Congress' power to demand obedience from state legislatures. In time, this scheme might have relegated the States to mere departments of the National Government, a status the Court appears to endorse today. The Framers, however, eschewed this course, choosing instead to allow Congress to pass laws directly affecting individuals, and rejecting proposals that would have given Congress military or legislative power over state governments. In this way, the Framers established independent state and national sovereigns. The National Government received the power to enact its own laws and to enforce those laws over conflicting state legislation. The States retained the power to govern as sovereigns in fields that Congress cannot or will not pre-empt.[34] This product of

---

[33] Experience under the Articles of Confederation taught the Framers that multiple state legislatures, unchecked by any central power, "threat[en] danger not to the harmony only, but to the tranquillity of the Union." *Id.*, at 166 (quoting Madison). My analysis of the Framers' intent does not detract from the proper role of federal power in a federalist system, but merely requires the exercise of that power in a manner that does not destroy state independence.

[34] This Court quickly recognized that Congress' strength derives from its own enumerated powers, not from the ability to direct state legislatures. In *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819), the historic decision affirming Congress' power to establish a national bank, Chief Justice Marshall declared: "No trace is to be found in the constitution of an intention to create a dependence of the government of the Union on those of the states, for the execution of the great powers assigned to it. Its means are adequate to its ends; *and on those means alone was it expected to rely for the*

the Constitutional Convention, I believe, is fundamentally inconsistent with a system in which either Congress or a state legislature harnesses the legislative powers of the other sovereign.[35]

## III

During his last Term of service on this Court, Justice Black eloquently explained that our notions of federalism subordinate neither national nor state interests:

> "The concept does not mean blind deference to 'States' Rights' any more than it means centralization of control over every important issue in our National Government and its courts. The Framers rejected both these courses. What the concept does represent is a system in which there is sensitivity to the legitimate interests of

---

*accomplishment of its ends." Id.*, at 424 (emphasis added). See also S. Davis, The Federal Principle 114 (1978) (after examining history of Constitutional Convention, "only the principle of *duality* articulated in a single constitutional system of two distinct governments, national and state, each acting in its own right, each acting directly on individuals, and each qualified master of a limited domain of action, stands out as the clearest fact"); Salmon, *supra* n. 13, at 359 (discussing history of Constitutional Convention and concluding that substitution of Supremacy Clause for negative on state laws "evidenced the clear distinction in [the Framers'] minds between the supremacy of the nation, which they approved, and the power of the nation to control the functioning of the states, which they rejected").

[35] After the Convention, several thinkers suggested that the National Government might rely upon state officers to perform some of its tasks. Madison, for example, thought that Congress might rely upon state officials to collect national revenue. The Federalist No. 45, pp. 312–313 (J. Cooke ed. 1961). None of these suggestions, however, went so far as to propose congressional control of state legislative power. The suggestions, moreover, seemed to assume that the States would consent to national use of their officials. See also W. Anderson, The Nation and the States, Rivals or Partners? 86–87 (1957) (noting that First Congress rejected proposals to rely upon state officials to enforce federal law and suggesting that this decision to leave "the states free to work out, and to concentrate their attention and resources upon, their own functions" has become part of our constitutional understanding).

both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Younger* v. *Harris*, 401 U. S. 37, 44 (1971).

In this case, I firmly believe that a proper "sensitivity to the legitimate interests of both State and National Governments" requires invalidation of Titles I and III of PURPA insofar as they apply to state regulatory authorities. Accordingly, I respectfully dissent from the Court's decision to uphold those portions of the statute.