56 F.3d 1430
 312 U.S.App.D.C. 360, Util. L. Rep. P 14,046
 NEW CHARLESTON POWER I, L.P., Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Public Utilities Commission of the State of California, and
Southern California Edison Company, Intervenors.
 No. 94-1330.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 17, 1995.
Decided June 16, 1995.
 
 Petition for Review of Orders of the Federal Energy Regulatory Commission.
 Carol A. Smoots, Washington, DC, argued the cause, for petitioner. With her on the briefs, was Stephen L. Teichler, Washington, DC.
 Samuel Soopper, Atty., F.E.R.C., Washington, DC, argued the cause, for respondent. With him on the brief were Jerome M. Feit, Sol., and Joseph S. Davies, Jr., Deputy Sol., F.E.R.C., Washington, DC.
 Edward W. O'Neill, San Francisco, CA, Richard K. Durant, Rosemead, CA, and Joseph E. Stubbs, Washington, DC, were on the brief, for intervenors.
 Before: SILBERMAN, HENDERSON, and RANDOLPH, Circuit Judges.
 Opinion for the court filed by Circuit Judge RANDOLPH.
 RANDOLPH, Circuit Judge:
 
 
 1
 Should rain-soaked cow manure be treated like a volcanic eruption in the Philippines or, instead, like a golf ball that knocks out a high-voltage transformer? Odd as it may seem, that is one of the contested points in this strange case.
 
 
 2
 The case arises under legislation described as "the solution that won't die for the problem that did." Jeff Bailey, 'Purpa' Power, WALL ST. J., May 17, 1995, at A1. Whether that accurately portrays Sec. 210(a) of the Public Utilities Regulatory Policies Act of 1978 (PURPA), Pub.L. No. 95-617, 92 Stat. 3117 (codified at 16 U.S.C. Sec. 824a-3), is not our concern. The "problem," as the 1978 Congress foresaw it, was the high price of oil climbing ever higher and the country growing ever more dependent on foreign oil suppliers. A "solution," Congress thought, was to encourage alternative sources of electricity from "small power production facilities" in the hope of diminishing the demand for fossil fuels. FERC v. Mississippi, 456 U.S. 742, 750, 102 S.Ct. 2126, 2132, 72 L.Ed.2d 532 (1982). In PURPA terminology, "small power production facilities" are those with a capacity of less than 80 megawatts, producing electricity by using, as their "primary energy source, ... biomass, waste, renewable resources, geothermal resources, or any combination thereof," 16 U.S.C. Sec. 796(17)(A)(i). Congress directed the Federal Energy Regulatory Commission to set down rules requiring electric utilities to purchase electricity from qualifying facilities--"QFs," 16 U.S.C. Sec. 824a-3(a). With the QFs receiving this and other favorable treatment, PURPA spawned a new industry. Small power plants using windmills, or methane from landfills, or solar energy sprang up around the country.
 
 
 3
 An unusual, indeed unique, method of producing electricity from other than fossil fuels is at the center of the present dispute. In 1988, at a cost of $49 million, the 15 megawatt-capacity Mesquite Lake Facility in El Centro, California, came on line as a QF, designed to burn cattle manure to generate electricity for sale to Southern California Edison Company. Despite a steady supply of fuel from the farms and feedlots in the surrounding Imperial Valley (when running, the Facility burned 40 tons of manure an hour), the Facility ran into immediate operational difficulties. Furnaces failed, boiler tubes corroded, refractory ceiling bricks collapsed, equipment fouled. Incomplete combustion caused the Facility to exceed the level of carbon monoxide emissions allowed under its air permit. During 1989 and 1990, the Facility shut down for months at a time while repairs were made. Another partial shutdown occurred in 1992.
 
 
 4
 In February 1993, New Charleston Power I, L.P., the petitioner here, purchased the Mesquite Lake Facility and began repairing and redesigning it. By April, the refurbished Facility was ready for a test run. Once again the machinery sputtered as the old problem of boiler fouling reoccurred and new problems in handling ash arose. Petitioner blamed some of this on record-setting winter rains in the Imperial Valley. The rains began soaking the cow manure in December. As the rains continued and the cattle milled about in wet pens, the manure became "contaminated" with mud. It was this wet, mud-laden manure, petitioner says, that fouled the boilers and other equipment and caused, or at least exacerbated, the damage.
 
 
 5
 Although the Mesquite Lake Facility could not safely burn cow manure until repairs were made, it could still produce electricity from natural gas. And so in October 1993, petitioner requested the Commission to waive, for calendar years 1993 and 1994, its regulation limiting QFs to using fossil fuel for no more than 25 percent of their total annual energy supply. 18 C.F.R. Sec. 292.204(b)(1)-(2). Cow manure is "biomass" under Sec. 201's definition of "primary energy source." 18 C.F.R. Sec. 292.202(a). Only if a facility produces electricity from something other than fossil fuel may it retain its favored status as a QF. 16 U.S.C. Sec. 796(17)(C). The Sec. 201 definition of "primary energy source," however, excludes--"under rules prescribed by the Commission"--"the minimum amounts of the fuel required to alleviate or prevent ... unanticipated equipment outages." 16 U.S.C. Sec. 796(17)(B)(i)-(ii)(I). The Commission's rules promulgated in compliance with Sec. 201 state:
 
 
 6
 (1)(i) The primary energy source of the facility must be biomass, waste, renewable resources, geothermal resources, or any combination thereof, and 75 percent or more of the total energy input must be from these sources ...
 
 
 7
 * * * * * *
 
 
 8
 (2) Use of oil, natural gas, and coal by a facility may not, in the aggregate, exceed 25 percent of the total energy input of the facility during any calendar year period.
 
 
 9
 18 C.F.R. Sec. 292.204(b)(1) & (2).
 
 
 10
 The Commission will waive Sec. 292.204(b)(2)'s 25 percent rule if doing so would be in the public interest. Its orders initially refusing, and refusing again on rehearing, to waive the rule for petitioner are before us in this petition for judicial review.
 
 
 11
 Petitioner has two main arguments for setting the orders aside. The first is that the Commission misconstrued 18 C.F.R. Sec. 292.204(b)(2). (Petitioner denies that it is attacking the Commission's regulation as inconsistent with PURPA.) The 25 percent rule, petitioner tells us, was never meant to limit a facility's use of fossil fuel during--in the words of Sec. 201(17)(B)(ii)(I)--"unanticipated equipment outages." The Commission's preamble to the regulation indicates the opposite. Congress, in Sec. 201(17)(B)(ii)(I), ordered the Commission to determine in "rules" what amount of fossil fuel QFs would be permitted to use in alleviating outages. 16 U.S.C. Sec. 796(17)(B)(ii)(I). The 25 percent limitation, the Commission stated in its 1980 rulemaking, sets forth a "simple rule" "specifying the minimum amounts of fuel under clauses (i) and (ii)" of Sec. 201(17)(B). FERC STATS. & REGS., Regulations Preambles 1977-1981, p 30,134, at 30,945 (1980). Clause (ii) of Sec. 201(17)(B) contains the "unanticipated equipment outages" provision. The Commission explained to petitioner that its rule, "by permitting a small power production facility the leeway to utilize up to 25 percent fossil fuel, ... would enable the facility to prevent unanticipated equipment outages." New Charleston Power I, L.P., 66 F.E.R.C. p 61,221, at 61,502 (1994). There is thus no doubt whatever that the Commission intended its 25 percent rule to limit a QF's use of fossil fuel during outages.
 
 
 12
 This brings us to the volcano and the golf ball, and petitioner's second argument. After Mount Pinatubo erupted in June 1991, there was a sharp drop in solar radiation in the western United States. See Daggett Leasing Corp., 64 F.E.R.C. p 61,148, at 62,175, reh'g denied, 65 F.E.R.C. p 61,143 (1993). Solar-powered electrical generating facilities asked the Commission to waive the 25 percent rule because of the large aerosol cloud impeding their production of electricity and threatening their financial viability. The Commission granted the requests, allowing the companies to exceed the fossil fuel limit for 120 days, by which time the cloud was expected to dissipate. Daggett Leasing Corp., 64 F.E.R.C. at 62,178; Kramer Junction Co., 61 F.E.R.C. p 61,309, at 62,160 (1992), reh'g denied, 64 F.E.R.C. p 61,025 (1993). On the other hand, the Commission refused to grant a waiver to a facility designed to generate electricity by burning methane from a landfill. O'Brien Environmental Energy, Inc., 65 F.E.R.C. p 61,038 (1993). Next door was a driving range. One of the range's customers took to the tee and, with what must have been a powerful swing, smacked a golf ball off the range and into a bushing on the facility's high-voltage transformer, knocking it out of commission for several months. O'Brien Environmental Energy, Inc., 65 F.E.R.C. at 61,404. Petitioner thinks the heavy winter rains in California were more like the volcanic eruption in Kramer and Daggett than the errant golf ball in O'Brien. But the Commission held, for reasons well within bounds, see San Diego Gas & Electric Co. v. FERC, 904 F.2d 727, 731 (D.C.Cir.1990), that this case was closer to O'Brien than to Kramer and Daggett. "No single extraordinary event," the Commission wrote, caused petitioner's problems. New Charleston Power I, L.P., 65 F.E.R.C. p 61,378, at 63,027 (1993), reh'g denied, 66 F.E.R.C. p 61,221 (1994). Petitioner purchased the facility while the flooding was well underway and therefore should have anticipated difficulties with its local fuel supply. At any rate, while the contaminated manure might have exacerbated the problem of boiler fouling, it was far from the sole cause of the problem: "the facility has been plagued by boiler fouling since its inception," id. Petitioner's facility had a poor operating history long before the rains fell, as did the facility in O'Brien before the golf ball struck. While the technology used in petitioner's facility is doubtless innovative, the facility's checkered history led the Commission to question its effectiveness.
 
 
 13
 PURPA may well have been intended to encourage innovations. But when the innovations do not work, the statute does not entitle a facility to transform itself into what is essentially a gas-burning plant, reaping the benefits PURPA bestows only on QFs. Southern California Edison estimated that, had it purchased power from a non-QF generating plant during the time petitioners' facility was out of compliance, it would have saved $7 million per year in purchased power costs. The Commission properly refused to bend its rules and shift the risk of the Mesquite Lake Facility's nonperformance from petitioner's investors to Edison's ratepayers. The record contained no assurance that after the waiver period expired, the Facility would begin generating electricity from cow manure with any regularity.
 
 
 14
 Petitioner's remaining contentions do not merit discussion. These have been considered and rejected for the reasons given by the Commission.
 
 
 15
 The petition for review is denied.