The CITY OF NEW YORK, and Rudolph Giuliani, as Mayor of the City of New York, Plaintiffs,

v.

The UNITED STATES of America, and Janet Reno, as Attorney General of the United States, Defendants.

No. 96 Civ. 7758(JGK).

United States District Court, S.D. New York.

July 18, 1997.

Paul A. Crotty, Corporation Counsel of the City of New York by Gail Rubin, Hilary B. Klein, Assistant Corporation Counsels, New York City, for Plaintiffs.

Mary Jo White, U.S. Attorney for the Southern District of New York by Martin J. Siegel, Assistant U.S. Attorney, New York City, for Defendants.

Helaine Barnett, Legal Aid Society by Brigitte Laforest, Scott Rosenberg, New York City, for Amicus Curiae.

### OPINION AND ORDER

KOELTL, District Judge.

This is an action for declaratory and injunctive relief that presents a facial challenge to the constitutionality of two recently enacted federal statutory provisions that preempt a New York City (the "City") ordinance prohibiting City officials from sharing with federal authorities information about the immigration status of aliens. The plaintiffs allege that Section 434 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 and Section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (collectively, "Sections 434 and 642") violate the Tenth Amendment[1] and the Guarantee Clause[2] of the United States Constitution, and principles of federalism, because "(1) they directly prohibit States and localities from engaging in the central sover-

eign process of passing laws or otherwise determining policy; and (2) they usurp States' and local governments' administration of core functions of government, including the provision of police protection and regulation of their own workforces, in a statute that is not of general applicability." (Compl.¶ 2.)

The plaintiffs and the defendants now move for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c).[3] For the reasons explained below, the defendants' motion is granted, and the plaintiffs' motion is denied.

### I.

On a motion to dismiss, the factual allegations of the complaint are to be accepted as true and all reasonable inferences are construed in the plaintiff's favor. See Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995); Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994). When reviewing a Rule 12(c) motion for judgment on the pleadings, the Court applies the same standards as on a Rule 12(b)(6) motion. The Court "must view the pleadings in the light most favorable to, and draw all reasonable inferences in favor of, the non-moving party." Davidson v. Flynn, 32 F.3d 27, 29 (2d Cir.1994); Madonna v. United States, 878 F.2d 62, 65 (2d Cir.1989); see also National Ass'n of Pharmaceutical Mfrs., Inc. v. Ayerst Labs., 850 F.2d 904, 909 n. 2 (2d Cir.1988) (indicating that the Court treats a motion for judgment on the pleadings as if it were a motion to dismiss). A court should dismiss a complaint only "if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim

1. The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

2. The Guarantee Clause provides: "The United States shall guarantee to every State in this Union a Republican Form of Government...." U.S. Const. art. IV, § 4.

3. The Legal Aid Society also moves for an order granting leave to file a brief amicus curiae on behalf of the plaintiffs. A district court has broad discretion in deciding whether to accept

an amicus brief. See Long Island Soundkeeper Fund, Inc. v. New York Athletic Club, No. 94 Civ. 0436, 1995 WL 358777, at *1 (S.D.N.Y. June 14, 1995); Concerned Area Residents for the Environment v. Southview Farm, 834 F.Supp. 1410, 1413 (W.D.N.Y.1993); United States v. Ahmed, 788 F.Supp. 196, 198 n. 1 (S.D.N.Y.), aff'd, 980 F.2d 161 (2d Cir.1992); United States v. Gotti, No. CR–90–1051, 1991 WL 5728, at *1 (E.D.N.Y. 1991). Because this is a motion for judgment on the pleadings, leave to file the brief amicus curiae is granted, but leave to file the accompanying declaration and attachments is denied.

which would entitle him to relief.'" *Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, (1957)). Accordingly, the following facts are accepted as true for purposes of this motion.

On August 7, 1989, Edward I. Koch, then Mayor of the City of New York, issued Executive Order No. 124, which set forth the City policy concerning aliens. This Executive Order was reissued by both of Mayor Koch's successors. It provides in relevant part:

Section 2. Confidentiality of Information Respecting Aliens.

a. No City officer or employee shall transmit information respecting any alien to federal immigration authorities unless

(1) such officer's or employee's agency is required by law to disclose information respecting such alien, or

(2) such agency has been authorized, in writing signed by such alien, to verify such alien's immigration status, or

(3) such alien is suspected by such agency of engaging in criminal activity, including an attempt to obtain public assistance benefits through the use of fraudulent documents.

b. Each agency shall designate one or more officers or employees who shall be responsible for receiving reports from such agency's line workers on aliens suspected of criminal activity and for determining, on a case by case basis, what action, if any, to take on such reports. No such determination shall be made by any line worker, nor shall any line worker transmit information respecting any alien directly to federal immigration authorities.

c. Enforcement agencies, including the Police Department and the Department of Correction, shall continue to cooperate with federal authorities in investigating and apprehending aliens suspected of criminal activity. However, such agencies shall not transmit to federal authorities information respecting any alien who is the victim of a crime.

Section 3. Availability of City Services to Aliens.

Any service provided by a City agency shall be made available to all aliens who are otherwise eligible for such service unless such agency is required by law to deny eligibility for such service to aliens. Every City agency shall encourage aliens to make use of those services provided by such agency for which aliens are not denied eligibility by law.

Exec. Order 124.

On August 22, 1996, the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the "Welfare Reform Act"), Pub.L. No. 104–193, 110 Stat. 2105 (1996), was signed into law. Section 434 of the Welfare Reform Act, entitled "Communication between State and Local Government Agencies and the Immigration and Naturalization Service," provides:

Notwithstanding any other provision of Federal, State or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.

As explained in the Conference Report to the bill,

[The conference agreement] does not require, in and of itself, any government agency or law enforcement official to communicate with the INS.

The conferees intend to give State and local officials the authority to communicate with the INS regarding the presence, whereabouts, or activities of illegal aliens.... The conferees believe that immigration law enforcement is as high a priority as other aspects of Federal law enforcement, and that illegal aliens do not have the right to remain in the United States undetected and unapprehended.

H.R.Conf.Rep. No. 725, 104th Cong., 2d Sess. 383 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2649, 2771.

On September 30, 1996, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (the "Immigration Reform Act"), Pub.L. No. 104–208, 110 Stat. 3009 (1996), was signed into law. Section 642 of

the Immigration Reform Act, entitled "Communication Between Government Agencies and the Immigration and Naturalization Service," provides in relevant part:

(a) IN GENERAL.—Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

(b) ADDITIONAL AUTHORITY OF GOVERNMENT ENTITIES.—Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

(1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

(2) Maintaining such information.

(3) Exchanging such information with any other Federal, State, or local government entity.

As explained by the Senate Judiciary Committee,

Effective immigration law enforcement requires a cooperative effort between all levels of government. The acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act.

S.Rep. No. 249, 104th Cong., 2d Sess. at 19–20 (1996).

## II.

As an initial matter, the defendants argue that Congress's plenary power over aliens requires the plaintiffs' adherence to, and lim-

its this Court's review of, Sections 434 and 642. The defendants contend that Congress's decision to advance the enforcement of immigration laws through optional information exchanges between state and local authorities and federal officials should be enforced, and any local law preventing those exchanges should be found invalid, because Congress has broad power to legislate on the subject of aliens. "Federal authority to regulate the status of aliens derives from various sources, including the Federal Government's power '[t]o establish [a] uniform Rule of Naturalization,' U.S. Const., Art. I, § 8, cl. 4, its power '[t]o regulate Commerce with foreign Nations', *id.*, cl. 3, and its broad authority over foreign affairs." *Toll v. Moreno*, 458 U.S. 1, 10, 102 S.Ct. 2977, 2982, 73 L.Ed.2d 563 (1982) (citations omitted). As the Supreme Court explained:

The Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization. Under the Constitution the states are granted no such powers; they can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states.

*Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419, 68 S.Ct. 1138, 1142, 92 L.Ed. 1478 (1948) (citation omitted); *see also Hines v. Davidowitz*, 312 U.S. 52, 66, 61 S.Ct. 399, 403–04, 85 L.Ed. 581 (1941) ("Consequently the regulation of aliens is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the state also acts on the same subject, 'the act of congress, or the treaty, is supreme; and the law of the state, though enacted in the exercise of powers not controverted, must yield to it.'") (quoting *Gibbons v. Ogden*, 9 Wheat. 1, 211, 22 U.S. 1, 211, 6 L.Ed. 23 (1824)).

In this case, the plaintiffs do not dispute Congress's power to regulate aliens. Instead, they contend that the Tenth Amendment, the Guarantee Clause, and principles of federalism limit the way in which Con-

gress can exercise its power over aliens. *See New York v. United States,* 505 U.S. 144, 160, 112 S.Ct. 2408, 2420, 120 L.Ed.2d 120 (1992). In *Printz v. United States,*[4] ── U.S. ──, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), the Supreme Court recently explained:

> The Supremacy Clause ... makes "Law of the Land" only "Laws of the United States which shall be made in Pursuance [of the Constitution]"; so the Supremacy Clause merely brings us back to the question discussed earlier, whether laws conscripting state officers violate state sovereignty and are thus not in accord with the Constitution.

*Id.* at ──, 117 S.Ct. at 2379. The issue in this case is not whether Congress has broad power to legislate concerning aliens, because it plainly does. The issue is rather whether, in exercising that power by enacting Sections 434 and 642, Congress has violated those provisions of the Constitution that limit the means Congress can use to affect the actions of state and local government officials. *See id.* at ── ── ──, 117 S.Ct. at 2379–84; *New York,* 505 U.S. at 159–69, 112 S.Ct. at 2419–25.

### III.

The plaintiffs' first cause of action alleges that by prohibiting the City from issuing executive orders, enacting legislation, or otherwise making policy regarding the reporting of undocumented aliens by City officials, the United States has commandeered the City's legislative and executive policymaking apparatus, diminishing political accountability and violating principles of federalism and the Tenth Amendment. (Compl.¶ 41.) The plaintiffs argue that Sections 434 and 642 are unconstitutional because they compel the City to bear the political responsibility for ad hoc decisions of City officials on whether to report on immigration status. They contend that the federal government may not avoid responsibility for decision-making or policy concerning aliens by directing the states to

allow their officials to assist the federal authorities in dealing with aliens.

It is now well settled that the Tenth Amendment and the principles of federalism inherent in the structure of the Constitution limit the ways in which Congress can require action by the states in pursuit of federal policies. In *New York v. United States,* the Supreme Court invalidated certain provisions of the Low–Level Radioactive Waste Policy Act Amendments of 1985 because it found that they required the states to enact or enforce a federal regulatory program. The Supreme Court instructed: "Congress may not simply 'commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.'" *New York,* 505 U.S. at 161, 112 S.Ct. at 2420 (quoting *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U.S. 264, 288, 101 S.Ct. 2352, 2366, 69 L.Ed.2d 1 (1981)). In *Printz,* the Supreme Court invalidated certain provisions of the Brady Handgun Violence Prevention Act (the "Brady Act") that enlisted state and local law enforcement officers to conduct background checks on prospective handgun purchasers and to perform certain other related tasks. *See Printz,* ── U.S. at ──, 117 S.Ct. at 2384. The Court added to *New York's* prohibition on commandeering state legislatures, a prohibition on commandeering state officials. The Supreme Court explained:

> We held in *New York* that Congress cannot compel the States to enact or enforce a federal regulatory program. Today we hold that Congress cannot circumvent that prohibition by conscripting the State's officers directly. The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program. It matters not whether policymaking is involved, and no case-by-case weighing of the burdens or benefits is necessary; such commands are fundamentally incompatible

---

4. Both parties discuss at length in their original motion papers the Court of Appeals' decision in *Frank v. United States,* 78 F.3d 815 (2d Cir.1996). *Frank,* however, has been vacated and remanded

by the Supreme Court for further consideration in light of *Printz. See Frank v. United States,* ── U.S. ──, 117 S.Ct. 2501, 138 L.Ed.2d 1007 (1997).

with our constitutional system of dual sovereignty.

*Printz,* ―― U.S. at ――, 117 S.Ct. at 2384.

■ However, Congress may encourage a state to regulate in a particular way or to provide incentives to the states as a method of influencing a state's policy choices, or may pass appropriate legislation in areas of federal concern that preempts contrary state laws. *See New York,* 505 U.S. at 166, 112 S.Ct. at 2423 ("Our cases have identified a variety of methods, short of outright coercion, by which Congress may urge a State to adopt a legislative program consistent with federal interests."); *Federal Energy Regulatory Comm'n v. Mississippi,* 456 U.S. 742, 762, 102 S.Ct. 2126, 2139, 72 L.Ed.2d 532 (1982) (*"FERC"*) ("[T]here are instances where the Court has upheld federal statutory structures that in effect directed state decisionmakers to take or to refrain from taking certain actions."). In other words, "valid federal enactments may have an effect on state policy—and may, indeed, be designed to induce state action in areas that otherwise would be beyond Congress' regulatory authority." *FERC,* 456 U.S. at 766, 102 S.Ct. at 2141.

■ The plaintiffs first argue that Sections 434 and 642 violate the Tenth Amendment and principles of federalism because they require state and local governments to adopt a policy permitting entities and officials to report immigration status to the INS, thereby directly interfering with the sovereign process of policymaking. But the Supreme Court in *Printz* found that an attempt to analyze congressional statutes on the basis of whether they require "policymaking" by the states is not a workable standard for determining whether the statutes violate the Tenth Amendment and principles of federalism inherent in the Constitution. In *Printz,* the Supreme Court found little merit in the attempt to distinguish between "making" law and merely "enforcing" it, between "policymaking" and mere "implementation." *See Printz,* ―― U.S. at ――–――, 117 S.Ct. at 2380–81.

■ The Supreme Court made it clear in *New York* that Congress has the power to regulate directly in an area of federal interest even if that regulation preempts contrary state legislation and thereby changes state policies. *See New York,* 505 U.S. at 166–67, 178, 112 S.Ct. at 2423–24, 2429–30. However, what Congress may not do, no matter how important the federal interest, is to require the states to regulate. *See id.* at 178, 112 S.Ct. at 2429–30.

■ Congressional legislation is not unconstitutional merely because it displaces state policy choices in an area in which Congress has the power to regulate. *See Hodel,* 452 U.S. at 290, 101 S.Ct. at 2367. In *South Carolina v. Baker,* 485 U.S. 505, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988), the Supreme Court rejected the argument that a federal law had "commandeered the state legislative and administrative process" because many state legislatures had had to amend a substantial number of statutes and because state officials had had to devote substantial effort to comply with the federal law:

> Such "commandeering" is, however, an inevitable consequence of regulating a state activity. Any federal regulation demands compliance. That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect.

*Id.* at 514–15, 108 S.Ct. at 1362.

In this case, Sections 434 and 642 do not require the City to legislate, regulate, enforce, or otherwise implement federal immigration policy. Instead, they direct only that City officials and agencies be allowed, if they so choose, to share information with federal authorities. The statutes do not even require any City official to provide any information to federal authorities. They only prevent the City from interfering with a voluntary exchange of information. Although the statutes can be characterized as interfering with a City policy that prevents its officials from cooperating with federal immigration authorities except in accordance with certain procedures, that effect on local policy is not the type of intrusion that is sufficient to violate the Tenth Amendment or principles of federalism.

■ The plaintiffs also argue that Sections 434 and 642 are analogous to the Brady Act provisions invalidated by the Supreme Court in *Printz*. The argue that just as it was unconstitutional to require state officials to perform background checks in *Printz,* it is unconstitutional to preclude the states and localities from preventing their officials from providing information on aliens to federal authorities. The Court's decision in *Printz* was based upon the Brady Act's intrusion on state sovereignty:

It is an essential attribute of the States' retained sovereignty that they remain independent and autonomous within their proper sphere of authority. It is no more compatible with this independence and autonomy that their officers be "dragooned" into administering federal law, than it would be compatible with the independence and autonomy of the United States that its officers be impressed into service for the execution of state law.

*Id.* at ——, 117 S.Ct. at 2381 (citations omitted).

However, the Supreme Court in *Printz* explicitly did not decide whether federal statutes that required the states to provide information to federal authorities were unconstitutional infringements on state sovereignty. As Justice O'Connor emphasized in her concurring opinion:

the Court appropriately refrain[ed] from deciding whether other purely ministerial reporting requirements imposed by Congress on state and local authorities pursuant to its Commerce Clause powers are similarly invalid. *See, e.g.,* 42 U.S.C. § 5779(a) (requiring state and local law enforcement agencies to report cases of missing children to the Department of Justice). The provisions invalidated here, however, which directly compel state officials to administer a federal regulatory program, utterly fail to adhere to the design and structure of our constitutional scheme.

*Id.* at ——, 117 S.Ct. at 2385 (O'Connor, J., concurring); *see also id.* at ——, 117 S.Ct. at 2376 ("The Government points to a number of federal statutes enacted within the past few decades that require the participation of state or local officials in implementing federal regulatory schemes.... [O]thers, which require only the provision of information to the Federal Government, do not involve the precise issue before us here.... For deciding the issue before us here, they are of little relevance.")

In this case, Sections 434 and 642 are even less intrusive on state sovereignty than those mandatory reporting statutes whose validity the Supreme Court explicitly refrained from deciding. Sections 434 and 642 do not require any reporting by any state and local officials. They merely prevent state and local authorities from interfering with the voluntary provision of information. They do not contravene the teaching of *Printz* that Congress cannot conscript state officers to carry out a federal regulatory program.

The plaintiffs also argue that political accountability will be compromised because the City will be forced to bear the brunt of public disapproval for its agents' decisions to provide information on aliens to federal authorities and for its failure to enact a different policy. They also argue that the federal government will escape accountability for the consequences of this reporting. Political accountability is one of the principles that led the Supreme Court to conclude that Congress lacked the power to compel the states to regulate. *See New York,* 505 U.S. at 168, 112 S.Ct. at 2424. "Accountability is ... diminished when, due to federal coercion, elected state officials cannot regulate in accordance with the views of the local electorate in matters not preempted by federal regulation." *Id.* For example,

[b]y forcing state governments to absorb the financial burden of implementing a federal regulatory program, Members of Congress can take credit for "solving" problems without having to ask their constituents to pay for the solutions with higher federal taxes. And even when the States are not forced to absorb the costs of implementing a federal program, they are still put in the position of taking the blame for its burdensomeness and for its defects.

*Printz,* —— U.S. at ——, 117 S.Ct. at 2382.

■ But although political accountability is a basis for concluding that Congress lacks

the power to compel the states to regulate or to conscript state and local officials in carrying out a federal program, political accountability standing alone is not a basis for invalidating a Congressional statute that does not implement a federal program in an impermissible way. Otherwise, Congressional statutes that appropriately preempted state law could be challenged on "political accountability" grounds because state officials could be blamed for changing or not implementing their laws.

In any event, the evils of the lack of political accountability identified in *New York* and *Printz* are not present in Sections 434 and 642. These Sections do not require the City to enact a legislative program for which it could be blamed, nor are its officials required to act as agents administering a federal program. Moreover, there is no basis in the pleadings in this case to conclude that local officials will be blamed for the individual, voluntary decisions of City employees who provide information to federal authorities. To the extent that there is any public criticism of the failure of the City to prevent its employees from providing information to federal authorities—which is itself only a speculative concern—the plaintiffs can claim legitimately that they are prevented by Sections 434 and 642 from interfering with City officials who wish to share data with federal authorities even though the plaintiffs would prefer a policy of confidentiality.

In their original motion papers, the plaintiffs also argued that Sections 434 and 642 were unconstitutional because they imposed an onerous burden on the City. In *Printz*, the Supreme Court explained that an evaluation of the extent of the burden placed upon state officers

> might be relevant if we were evaluating whether the incidental application to the States of a federal law of general applicability excessively interfered with the functioning of state governments. But where, as here, it is the whole object of the law to direct the functioning of the state executive, and hence to compromise the structural framework of dual sovereignty, such a "balancing" analysis is inappropriate. It is the very principle of separate state sovereignty that such a law offends, and no comparative assessment of the various interests can overcome that fundamental defect.

*Printz*, —— U.S. at ——, 117 S.Ct. at 2383 (citations and footnote omitted). The plaintiffs now contend that any inquiry as to whether the City or its officials are burdened by being enlisted in administering federal immigration law is foreclosed by *Printz* because Sections 434 and 642 are not laws of general applicability. In any event, even if a balancing analysis were appropriate in this case, the plaintiffs have not alleged a current burden on City officials in their complaint. And indeed any complaint of burden upon City officials would be wholly speculative. There is nothing in the statutes that requires any reporting by any City officials, and there is no basis even to speculate that City officials will spend so much time providing information to federal authorities that it will interfere with their official City duties. There is, in short, no valid argument based on a burden on City officials that is sufficient to invalidate Sections 434 and 642.

Accordingly, because Sections 434 and 642 do not compel the City to legislate or regulate and do not commandeer City officials in the enforcement of a federal program, Sections 434 and 642 do not violate the Tenth Amendment or principles of federalism. The plaintiffs' first cause of action is therefore dismissed.

## IV.

■ The plaintiffs' second cause of action alleges that by interfering with core functions of City government, by means of a statute directed only at states and localities and not at private individuals, the United States has violated principles of federalism and the Tenth Amendment. The plaintiffs argue that Sections 434 and 642 seriously interfere with the City's ability to define the duties of its own workforce, particularly personnel charged with the preservation and protection of public health and safety. The plaintiffs contend that under a substantive analysis of the Tenth Amendment, Sections 434 and 642 strike at the heart of traditional

"incidents of state sovereignty," and should be found invalid.

In *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the Supreme Court held that the Commerce Clause does not empower Congress to enforce the minimum wage and overtime provisions of the Fair Labor Standards Act against the states "in areas of traditional governmental functions." *Id.* at 852, 96 S.Ct. at 2474. The Court provided some examples of "traditional governmental functions," but did not offer a general explanation of how a "traditional" function should be distinguished from a "nontraditional" one. In *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), which overruled *National League of Cities*, the Court invalidated the use of a substantive analysis to determine whether particular incidents of state sovereignty were immune from federal government regulation. *See id.* at 546–47, 105 S.Ct. at 1015 ("We therefore now reject, as unsound in principle and unworkable in practice, a rule of state immunity from federal regulation that turns on a judicial appraisal of whether a particular governmental function is 'integral' or 'traditional.'"). The Court explained that the difficulty in defining the scope of the governmental functions had made the standard unworkable. *See Garcia*, 469 U.S. at 538–41, 548, 105 S.Ct. at 1010–12, 1016. The Court concluded that "[s]tate sovereign interests ... are more properly protected by procedural safeguards inherent in the structure of the federal system than by judicially created limitations on federal power." *Id.* at 551, 105 S.Ct. at 1018; *see also id.* at 556, 105 S.Ct. at 1020 ("The political process ensures that laws that unduly burden the States will not be promulgated.").

The plaintiffs argue, however, that the substantive analysis under the Tenth Amendment survives *Garcia* when legislation is directed solely at states or local governments. But the Court in *Garcia* was clear that the "traditional governmental function" test does not survive in any form:

> The problem is that neither the governmental/proprietary distinction nor any other that purports to separate out important

governmental functions can be faithful to the role of federalism in a democratic society. The essence of our federal system is that within the realm of authority left open to them under the Constitution, the States must be equally free to engage in any activity that their citizens choose for the common weal, no matter how unorthodox or unnecessary anyone else—including the judiciary—deems state involvement to be. Any rule of state immunity that looks to the "traditional," "integral," or "necessary" nature of governmental functions inevitably invites an unelected federal judiciary to make decisions about which state policies it favors and which one it dislikes.

*Garcia*, 469 U.S. at 545–46, 105 S.Ct. at 1015. Neither *Printz* nor *New York* revived a substantive analysis under the Tenth Amendment. Both relied upon the structural defects in the Congressional statutes at issue that impinged on state sovereignty without an analysis of whether the state functions that were affected were core functions of the states. The defects identified in *New York* and *Printz* do not exist in Sections 434 and 642. In view of the Supreme Court's analysis in those cases, and the explicit instructions in *Garcia*, it would be inappropriate to resurrect a substantive Tenth Amendment analysis.

Accordingly, the plaintiffs' second cause of action is dismissed.

### V.

The plaintiffs' third cause of action alleges that by interfering with the ability of states and local governments and their duly-elected officials to represent the electorate by engaging in the sovereign process of passing legislation or otherwise enacting a policy that prohibits or restricts their officials from sending information to the INS, Sections 434 and 642 violate the Guarantee Clause. The Guarantee Clause provides that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government...." U.S. Const. art. IV, § 4. However, the Supreme Court has traditionally found that claims brought under the Guarantee Clause present nonjusticiable political questions. *See City of Rome v. United*

*States,* 446 U.S. 156, 182 n. 17, 100 S.Ct. 1548, 1564 n. 17, 64 L.Ed.2d 119 (1980); *Baker v. Carr,* 369 U.S. 186, 218–29, 82 S.Ct. 691, 710–16, 7 L.Ed.2d 663 (1962); *Pacific States Tel. & Tel. Co. v. Oregon,* 223 U.S. 118, 140–51, 32 S.Ct. 224, 227–31, 56 L.Ed. 377 (1912); *see also Padavan v. United States,* 82 F.3d 23, 28 (2d Cir.1996). Although it is possible that "perhaps not all claims under the Guarantee Clause present nonjusticiable political questions," *New York,* 505 U.S. at 185, 112 S.Ct. at 2433, there is no basis in this case for the conclusion that the plaintiffs have presented a justiciable claim. "[N]othing in their complaint indicates in any way that federal immigration policies are depriving New York [City] of a republican form of government." *Padavan,* 82 F.3d at 28. Moreover, any protection under the Guarantee Clause could hardly be more extensive than the protection afforded the states under the Tenth Amendment and principles of federalism, which are not violated by Sections 434 and 642.

Accordingly, the plaintiffs' third cause of action is dismissed.

## CONCLUSION

For the reasons explained above, the defendants' motion for judgment on the pleadings is **granted**, and the plaintiffs' cross-motion for judgment on the pleadings is **denied**. The Clerk is directed to enter Judgment dismissing the action and closing the case.

**SO ORDERED.**